### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF PENNSYLVANIA

-------------------------------------------------------------------X

Geta Miclaus, and Vim and Kevin Byrne,
On Behalf of Themselves and All Other Persons
Similarly Situated,

                2:20-cv-681

                Plaintiffs,

    -against-

                        **Complaint**

                        **Class Action**

                        **Jury Trial Demanded**

Invention Submission Corporation d/b/a InventHelp,
Technosystems Consolidated Corp., Technosystems
Service Corp., Western Invention Submission Corp.
d/b/a/ Western InventHelp, Universal Payment
Corporation, Intromark Incorporated, Robert J. Susa,
Thomas Frost, P.A., Thomas Frost,
John Doe Companies 1-10, John Doe Individuals 1-10,

                Defendants.

-------------------------------------------------------------------X

### CLASS ACTION COMPLAINT

      Plaintiffs, on behalf of themselves and all others similarly situated, make the following

allegations on personal knowledge as to their own actions and upon information and belief:

### NATURE OF THE ACTION

      1.     This class action arises out of a deceptive and fraudulent invention promotion

scam that has bilked thousands of aspiring inventors into paying millions of dollars to

Defendants.  This action is filed as a related action to *Calhoun v. Invention Submission

Corporation et al.*, 18-1022.  The Class Representatives herein are individuals who signed

contracts with Defendants in 2017 and received disclosures from Defendants that contain significant omissions.

2.      The gravamen of this case is Defendants' outright, deliberate and fraudulent violation of the American Inventors Protection Act of 1999 ("AIPA"), 35 U.S.C. § 297.

3.      Defendants' AIPA disclosures omit statutorily-mandated information.

4.      For example, Western InventHelp clients are not provided with proper AIPA-mandated disclosures.  The disclosures on behalf of Western InventHelp omit information regarding clients' receipt of licensing agreements, among other omissions.

5.      Additionally, Defendants provide no AIPA-mandated disclosures with regard to Defendant Intromark Incorporated.  All InventHelp and Western InventHelp customers who sign Submission Agreements with those entities also sign invention promotion contracts with Defendant Intromark; Defendants' AIPA omissions thereby impact all InventHelp customers as a whole.

6.      Independently, Defendants' AIPA disclosures are inaccurate and fraudulent.  As detailed at length *infra*, InventHelp concocts bogus "60-day license  agreements" on behalf of sham companies in order to manipulate and falsify its AIPA disclosure numbers.  *See* 35 U.S.C. § 297(a)(4).

7.      InventHelp includes these falsified numbers in its AIPA disclosures to all clients (none of whom know or have reason to know that the numbers are falsified), thereby defrauding all InventHelp customers as a whole.

8.      Defendants and their agents intentionally misrepresent and omit material facts and willfully fail to disclose material facts to customers as a matter of regular business practice, also in violation of the AIPA.  *See* 35 U.S.C. § 297(b).

9.      For example, as part of its standard business practice, InventHelp sends customers lists of companies allegedly in its 'DataBank' that have purportedly agreed to "review new ideas in confidence."  In truth and in fact, many of the companies on these lists do not even exist and/or are sham companies.  Others have not agreed to "review new ideas in confidence," have not signed non-disclosure agreements, and have no relationship whatsoever with InventHelp.

10.     Defendants' entire business model and enterprise is fraudulent, from start to finish.  After being lured in by Defendants' slick advertising and sales tactics, Class Plaintiffs are induced to sign expensive Submission Agreement contracts based upon Defendants' purposefully incomplete patent searches and basic information package reports.

11.     InventHelp and its agents make many misrepresentations of present fact in order to induce customers to sign the "Submission Agreements" thereby handing over to Defendants enormous sums of money.

12.     InventHelp represents to prospective and existing clients that it has relationships with certain well-known entities, brands and big-box stores, including K-Mart, Walmart, Bed Bath & Beyond, Lysol, Air Wick, Cabela's, Elmer's, Heinz, and Carnegie Mellon University, and that these entities are registered in InventHelp's "DataBank."  (*See* **Exhibits A** and **B** hereto).  These representations are false, misleading and contain outright lies.

13.     Customers who sign up for the first, less expensive step of InventHelp's services receive a hard-bound InventHelp "Report" and a "Preliminary Patentability Opinion" purportedly authored by Patent Attorney Defendant Thomas Frost.

14.     InventHelp relays these reports to its clients.  Both documents are purposefully obtuse, contain omissions and misrepresentations, and serve as InventHelp's hook to set up additional meetings under the guise of "explaining the reports," "going over the patent results" or

"revising the reports." In truth, these reports and patentability opinions are InventHelp's crucial first step in its scheme to trick inventors into second meetings in which they are upsold into signing exorbitantly expensive Submission Services Agreements, which cost approximately $13,500 - $30,000 a pop.

15.     Defendants' "Preliminary Patentability Opinions," opine that customers' proposed inventions are eligible to receive design or utility patents, when, in fact, there often already exist "dead ringer" patents that preclude patents for these inventions.

16.     These are but a few examples of the rampant and blatant fraud perpetrated by Defendants as a matter of company policy.

17.     Defendants' ubiquitous late-night television and internet commercials, featuring a cartoon image of a caveman sitting on a rock, banging a wheel with a chisel, promise consumers that InventHelp has contracts with thousands of companies that are looking for new ideas. The commercials state, "We keep your idea confidential"; "We explain every step of the invention process"; "We create professional materials representing your idea and submit it to companies who are looking for new ideas"; "We have more than 9,000 companies who have agreed to review ideas, in confidence," among other representations.

18.     In truth and in fact, InventHelp does not keep its customers' ideas confidential, does not have "relationships with more than 9,000 companies who have agreed to review ideas, in confidence" and does not provide customers with "professional looking materials."

19.     To the extent InventHelp does send out mass mailings of flyers describing consumers' inventions, many recipients of the flyers have not signed nondisclosure agreements, have no relationship whatsoever with InventHelp, and/or do not even exist.

20.    Defendants' regular practice thus puts Plaintiffs' ideas in the public realm thereby impacting potential patentability.

21.    Defendants' regular practice also risks theft of Plaintiffs' unpatented ideas.

22.    Defendants' regular practice also decreases and/or eliminates the salability of Plaintiffs' inventions because these ideas become public.

23.    InventHelp is also engaged in the unauthorized practice of law and the unauthorized advertisement of legal services.  For example, InventHelp's television and internet advertisements state:  "How do you get a patent?  Call InventHelp – they've been helping people just like you for 35 years."  Others state:  "We have been helped over 10,000 clients get patents." Yet others state:  "Do you want to try to get a patent?  Call InventHelp now."

24.    During customers' meetings with InventHelp, non-lawyer InventHelp representatives explain and advise customers with respect to the Thomas Frost Patentability Opinions as a matter of standard company practice.

25.    InventHelp fraudulently targets minorities and women through the use of misleading websites, including www.black-inventor.com and www.women-inventor.com.  These websites, although purporting to be educational pages, are in fact InventHelp advertisements.

26.    Whilst InventHelp, Universal Payment Corporation, Intromark, and the other named Defendants hold themselves out to be independent companies, they are one and the same, and are parts of an integrated fraudulent enterprise.  The schemes, trickery, and fraud set forth herein are universal and indistinguishable, notwithstanding the titles of the entities with which Class Plaintiffs believe they are dealing.

27.    Defendants craft their polished marketing materials (including television advertisements, internet ads, web pages and telemarketing calls) to create the impression that

Defendants have successfully helped other consumers monetize their inventions, and thus that Defendants are reliable and reputable. Defendants' offices are decorated with supposed successful inventions, often labeled, "As Seen On TV," in order to further create the impression that they are a legitimate enterprise. In truth and in fact, Defendants are a fraud.

28.     Defendants' multi-tiered conspiracy preys upon consumers' high hopes and dreams. It is cleverly constructed to avoid liability and monetary judgment by employing an intricate web of entities – invention promotion companies, licensing agents, private money lenders, patent attorneys and agents, licensing and distribution companies – that act in concert to defraud Class Plaintiffs.

29.     Defendants employ sophisticated and crafty mechanisms to escape liability, including the insertion of fraudulent clauses into their various contracts designed to extinguish would-be private litigants' rights.

30.     Because Class Plaintiffs often do not have at hand the tens of thousands of dollars 'necessary' to make their dreams come true, they are offered generous loans by "independent private money lender" Universal Payment Corporation.

31.     This "independent private money lender" is not independent at all – it operates under the identical ownership and control as InventHelp, has no actual business address other than a P.O. Box, and is an indispensable arm of the fraudulent scheme described herein.

32.     Class Plaintiffs agree to pay the steep initial fees out of pocket (often selling personal property, remortgaging their homes, or borrowing from family members) or to loan the money from Defendant Universal Payment Corporation. In the meantime, Defendants make off with Class Plaintiffs' money and do little to nothing to fulfill their end of the bargain, stringing

Class Plaintiffs along with false promises and boilerplate "analyses" in order to extract more money, and then disappearing and dodging calls as soon as Defendants have the money in hand.

33.    Once consumers sign the expensive agreements, they receive a flurry of paperwork for years on end, giving them the continuing impression that Defendants are working on their behalf.  In truth and in fact, Defendants are generating this paperwork in order to create this impression, with no expectation that the proposed inventions will be licensed.  Indeed, on the rare occasion that a legitimate company expresses interest in an InventHelp client's idea, that company has no means of contacting InventHelp other than the 1-800 number advertised on InventHelp's late-night television commercials.  These calls go unreturned.

34.    Sometimes, InventHelp reaches out to existing clients, representing that outside companies have discovered their inventions, and that those companies now want to license the products pursuant to "60-day license agreements."

35.    Defendants falsely represent to these clients that "60-day license agreements" are standard industry practice.  InventHelp customers sign the paperwork and excitedly wait for their dreams to come true.  Inevitably, the sham licensing companies decide against "renewing" the fake 60-day licenses.

36.    In the meantime, InventHelp files fraudulent tax documents with the U.S. Federal government, representing that clients received licensing agreements, when, in truth and in fact, these purported "60-day licenses" are concocted solely for the purpose of bolstering InventHelp's AIPA disclosures – InventHelp includes the sham "60-day licenses" in their AIPA numbers, thereby falsely representing to existing and potential clients the number of InventHelp customers who received licensing agreements.

37.     Fraud permeates all of the dealings and contracts between Class Plaintiffs and all Defendants herein, from start to finish.  Defendants' enterprise as a whole is fraudulent, and Defendants fraudulently induce Class Plaintiffs to sign various contracts.

38.     Defendants also fraudulently misrepresent the actual content of the contracts between Defendants and Class Plaintiffs, thereby tricking Class Plaintiffs into signing documents that state different terms and conditions than those represented by Defendants (*fraud-in-the-factum*).

39.     Before consumers have the opportunity to meaningfully review the lengthy, complicated contracts at issue, Defendants use high-pressure tactics, routinely telling consumers that "today is the very last day" of a "special" or "promotion" that will save consumers hundreds or thousands of dollars, but that in order to get these savings, consumers must sign immediately, before leaving the office.  These statements are a matter of company policy, and are false and fraudulent – there are no such "specials" or "promotions" that are about to expire.

40.     As detailed herein, when customers express concern about their ability to make future payments pursuant to the contracts, Defendants' representatives point out Paragraph 3 of the Submission Agreement, falsely representing to customers that this clause enables them to stop making payments with no penalties, when, in truth and in fact, it does not.

41.     Defendants' actions are particularly egregious because many of their customers are of modest means.  Defendants' representatives employ high pressure tactics to push Class Plaintiffs to hand over tens of thousands of dollars and sign fraudulent contracts, falsely representing to Class Plaintiffs the actual content of those contracts, that if Class Plaintiffs sign immediately (without time to properly review the contracts) they will receive substantial discounts pursuant to "specials" that are about to expire, that Class Plaintiffs' proposed

inventions are one-of-a-kind and/or carry terrific potential for profit, and that Class Plaintiffs likely stand to make 'millions' or 'billions' if they engage Defendants' services.

42.    Defendants also use nefarious means to censor, block and/or mask negative reviews of InventHelp, thereby preventing consumers from seeing what really happens to those who sign up for their services.

43.    In order to obstruct consumers' view of the hundreds of negative reviews of InventHelp on the consumer-targeted internet websites www.pissedconsumer.com, and www.ripoffreport.com, Defendants employ sophisticated mechanisms (including purchasing domain names) to redirect those consumers to InventHelp's own website, or otherwise redirect consumers without consumers' knowledge and/or consent, to false and fraudulent glowing reviews.

44.    Defendants also employ deceptive and fraudulent tactics by using threats, intimidation and harassment to collect debts.  In order to induce Class Plaintiffs to sign contracts, Defendants represent that if Class Plaintiffs can no longer make payments, then, pursuant to Paragraph 3 of the Submission Agreement, there is "no risk" – the contracts will simply expire with no further performance on either end.  However, if and when Class Plaintiffs stop paying, Defendants dog Class Plaintiffs, threaten to "destroy" Plaintiffs' credit, and threaten to put liens on their homes and other personal property.

45.    Defendants call Class Plaintiffs multiple times per day, often on Plaintiffs' cell phones, and verbally threaten and harass, oftentimes using foul language.

46.    As detailed *infra*, Defendants' actions violate the AIPA and give rise to liability pursuant to a variety of common law claims, including fraud and breach of contract, among others.

## THE PARTIES

47.     Plaintiff Geta Miclaus is an individual who is a citizen of California, residing at 1532 Rainbow Drive, Santa Ana, California, 92705.

48.     Plaintiffs Vim and Kevin Byrne are married individuals who are citizens of the State of California, residing at 6084 Rising Star Drive, Eastvale, California, 92880.

49.     The entities and individuals listed in paragraphs 50-59 have engaged in and have conspired to engage in a pattern of fraudulent activity, have each committed numerous acts as part of their scheme to defraud Class Plaintiffs, have each participated in the operation or management of a fraudulent enterprise, and have each acted with actual authority and/or apparent authority on behalf of each and every Defendant herein.

50.     Defendant Invention Submission Corporation does business under the names 'InventHelp,' 'Western InventHelp,' and 'Innovation Communications,' among others, and is located in the same office, and shares identical ownership, management and employees, with InventHelp, Technosystems Consolidated Corporation, Western Invention Submission Corporation, Technosystems Service Corporation, and Intromark Incorporated (collectively, including Defendants Universal Payment Corporation and Robert J. Susa, "InventHelp" or "InventHelp Defendants").

51.     Consumers who sign contracts with InventHelp and/or Western InventHelp (including Named Plaintiffs herein) sign an explicit acknowledgement that InventHelp, Invention Submission Corp., Western InventHelp, and Technosystems Service Corporation will all be performing services under the contracts, regardless of the particular contract's corporate signatory.  All contracts signed by any InventHelp Defendant are ultimately signed by Angela Beauchamp, in Pittsburgh PA, on behalf of each and every entity.  Although Plaintiffs often sign

contracts with multiple entities at the same time – for example, Western InventHelp and Intromark Incorporated – all letters they receive thereafter are on InventHelp letterhead and are signed by unnamed "InventHelp Representatives" and/or "Your Client Services Department."

52.    Defendant Invention Submission Corporation d/b/a/ InventHelp and d/b/a/ Innovative Communications, is a Pennsylvania corporation with its principal place of business located at 217 9th Street, Pittsburgh, Pennsylvania 15222.

53.    Defendant Technosystems Consolidated Corporation identifies its "web URL" as "www.inventhelp.com."   It is a Delaware corporation with its primary place of business located at 217 9th Street, Pittsburgh, Pennsylvania 15222.  Named Plaintiffs and proposed Class Plaintiffs who sign contracts with InventHelp, Universal Credit Corp., and/or Western InventHelp, are actually charged on credit card statements by Technosystems Consolidated Corporation.

54.    Defendant Technosystems Service Corporation is a Delaware Corporation with a primary place of business located at 217 9th Street, Pittsburgh, PA 15222.   Individuals who contract with InventHelp and/or Western InventHelp sign an explicit acknowledgement that Technosystems Service Corporation will:  "engage in performing invention development services under this Contract."

55.    Defendant Western Invention Submission Corporation ("WISC" or "Western InventHelp") is a North Carolina Corporation with a principal place of business located at 217 9th Street, Pittsburgh, PA 15222.  WISC operates under the registered name Western InventHelp. Individuals who contract with WISC sign the following acknowledgement:  "[WISC] is the name of the corporation contracting to perform the Invention development services.  WISC is operating under its registered name, Western InventHelp.  The parent company is

TECHNOSYSTEMS CONSOLIDATED CORPORATION.  There are no subsidiary or affiliated companies that will engage in performing invention development services under this Contract except INVENTION SUBMISSION CORPORATION, an affiliate, and TECHNOSYSTEMS SERVICES CORPORATION, an affiliate.  Company is also affiliated with INTROMARK INCORPORATED which attempts to market inventions . . . ."  "Western InventHelp's principal business address is: 217 Ninth Street, Pittsburgh, Pennsylvania 15222."

56.    Defendant Intromark Incorporated is a Pennsylvania Corporation with a primary place of business located at 217 9th Street, Pittsburgh, PA 15222.

57.    Defendant Universal Payment Corporation is a Pennsylvania Corporation with a principal place of business listed at 903 Liberty Avenue, 3rd Floor, Pittsburgh, PA 15222. Individuals who finance their contracts with Defendants do so through this entity, which operates under the same ownership, management and control as InventHelp.

58.    Defendant Robert J. Susa is President of all of the InventHelp Defendants - Defendants Invention Submission Corporation d/b/a InventHelp, Technosystems Consolidated Corporation, Technosystems Service Corporation, Western Invention Submission Corporation d/b/a Western InventHelp, Universal Payment Corporation, Innovation Communications, and Intromark, Incorporated.  Mr. Susa is an individual who is a citizen of the Commonwealth of Pennsylvania, residing at 4190 and 4240 Muirfield Circle, Presto, Pennsylvania 15142-1069.

59.    Defendant Thomas Frost is a patent attorney licensed to practice in the State of Florida, and is the principal of Defendant Thomas Frost, P.A. (collectively, the "Frost Attorney Defendants"), with a primary place of business at 6600 Fourth Street North, Suite 102, Saint Petersburg, Florida 33702.

60.     Defendants 'John Doe' Individuals and 'John Doe' Companies are unidentified persons and entities that participate in the fraud described herein.

## JURISDICTION

61.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. Sections 1331, 1332(d)(2)(A). This Court has original jurisdiction over this civil action as it arises under the Constitution, laws, or treaties of the United States.  This Court also has original jurisdiction because the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which a member of the class of plaintiffs is a citizen of a state different from the defendants.

62.     Venue is proper pursuant to 28 U.S.C. Section 1391.

63.     Exercise of jurisdiction over Defendants is proper.  Defendants are subject to general jurisdiction in the Commonwealth of Pennsylvania.  Defendants' principal places of business are located in Pittsburgh, Pennsylvania, they regularly transact extensive business activities in Pennsylvania, and are licensed and/or authorized to do business in Pennsylvania. Moreover, Defendants are subject to specific jurisdiction in Pennsylvania because they have transacted and continue to transact business in Pennsylvania, have engaged in tortious conduct in Pennsylvania, receive all business and referrals by virtue of Pennsylvania entities, and there is a substantial nexus between Defendants' purposeful availment of the Pennsylvania forum and Plaintiffs' claims.

64.     Defendants have significant contact with Pennsylvania such that they are subject to the personal jurisdiction of this Court.  This Court's assertion of jurisdiction over Defendants is consistent with the notions of fair play and substantial justice.  Defendants purposefully avail themselves of the benefits of Pennsylvania such that they could reasonably anticipate being

hauled into Court here, or otherwise directed their conduct toward this Pennsylvania such that the effects of their damages were occasioned upon Plaintiffs within Pennsylvania.

## **FACTUAL BASIS FOR CLAIMS**

65.    The instant Complaint tells the stories of two InventHelp customers who are currently working on the front lines of the COVID-19 pandemic.

66.    Geta Miclaus, a Registered Nurse, risks the health and safety of herself and her family by caring for hospitalized COVID-19 patients.  She has spent over $15,000 for InventHelp's worthless, false, and fraudulent "services."

67.    Kevin Byrnes works full time as a grocery store manager that currently remains open as an essential business during the COVID-19 crisis.  The Byrnes have spent over $12,000 for InventHelp's worthless, false, and fraudulent "services."

68.    Each Named Plaintiff (and potential class member) was presented with incomplete, false and misleading AIPA disclosures; each Named Plaintiff (and potential class member) signed expensive contracts by virtue of incomplete, false and misleading statements, advertisements and reports; and each Named Plaintiff (and potential class member) was strung along for years on end with false and misleading letters and communications from InventHelp, including the false representation that InventHelp was sending information describing their inventions to "DataBank" companies that had signed nondisclosure agreements, when, in fact, InventHelp was not.

*    *    *

69.    Plaintiff Geta Miclaus is a Registered Nurse who works at Kaiser Permanente Medical Center, a hospital located in Riverside, California.

14

70.     In 2017, she came up with a potential invention – an inflatable tourniquet controlled by a foot pedal that would enable nurses and other medical professionals to more safely and easily insert "Peripherally Inserted Central Catheters" (otherwise known as "PICC Lines") into patients' arms.

71.     After seeing several InventHelp television commercials, she contacted the company through its website, inventhelp.com.

72.     Ms. Miclaus is an intelligent and educated woman; she had researched InventHelp and found many glowing reviews.

73.     Unbeknownst to her, in order to obstruct consumers' view of the hundreds of negative reviews of InventHelp, Defendants employ sophisticated mechanisms to redirect consumers searching for objective reviews to InventHelp's own website to false and fraudulent glowing reviews.

74.     InventHelp pays sophisticated "reputation management professionals" to erase bad reviews online, falsely representing to website administrators that certain bad reviews have been ruled defamatory by court orders, when, in fact, they have not.  For example, InventHelp engaged Florida "reputation management lawyer" Zachary Sloan to erase negative online InventHelp reviews; the purported court orders relating to those reviews are nonexistent.

75.     On or about August 31, 2017, Geta Miclaus received an email from InventHelp providing her with contact information for "Your InventHelp representative, Jim Cardiges." That email also contained a video purportedly describing InventHelp's services and success, including information about InventHelp's so-called "DataBank" of companies.

76.     Attached hereto as **Exhibit A** is a screenshot of a that online video advertisement sent by InventHelp to Geta and available for viewing by the public at large.  That advertisement

states:  "More than 8,000 Companies in the InventHelp DataBank."  The advertisement then

flashes the names and logos of dozens of reputable and well-known companies, such as Cabela's,

Toro, Heinz, waterpik, Elmer's, Kraft, Clorox, Bosch, among others.  The message conveyed by

this advertisement is false, ambiguous and deceptive.

77.     Attached hereto as **Exhibit B** is another screenshot of that advertisement sent by

InventHelp to Geta and available for viewing by the public at large.  The advertisement states:

"InventHelp's Inpex Product Searches" and then flashes the names and logos of various well-

known companies, including "Tupperware," Rubbermaid," "green works," Glad," "Tilex,"

Kraft," Elmers," Walmart," "K-Mart," Autozone," "Mucinex," Woolite," and "Clearasil," among

others.   The message conveyed by this advertisement is false, ambiguous and deceptive.

78.     On that same date, Geta received a second video from InventHelp in which

Defendant Robert J. Susa states, "InventHelp strikes about 50 licensing deals a year on behalf of

inventors."  Defendant Susa made this statement knowing that it was false and misleading, or

with reckless disregard for its truth or falsity.

79.     Geta called Mr. Cardiges to make an appointment, and met with him at

InventHelp's Irvine, California office on September 11, 2017.

80.     Mr. Cardiges told Geta that her idea was extremely marketable and carried

immense potential for profit.

81.     Geta signed a Basic Information Package Agreement for $760 and Preliminary

Patentability Search and Opinion Referral Request for $215, both with the entity Western

InventHelp, signed by Mr. Cardiges, at the September 11, 2017 meeting.

82.     Mr. Cardiges presented Geta with two InventHelp disclosure documents at the

meeting.  One states:  "From 2014-2016, we signed Submission Agreements with 7,039 clients.

As a result of our services, 159 clients have received license agreements for their products, and 35 clients have received more money than they paid us for these services."

83.      The second InventHelp disclosure provided to Geta at that meeting states:  "The total number of customers who have contracted with InventHelp in the past 5 years is 10, 323. . . .  [T]he total number of clients known to have received more money than they paid InventHelp for submission services as a direct result of these services is 45.  The total number of customers known by InventHelp to have received license agreements for their inventions as a direct result of InventHelp services is 236."

84.      Although Ms. Miclaus did not know it at the time, the numbers in both of these disclosure documents are incomplete, false and misleading by virtue of their inclusion of sham licensing agreements, and their exclusion of information required by the AIPA.

85.      Mr. Cardiges also provided Geta with Western InventHelp disclosure documents at the September 11, 2017 meeting.  Those disclosures state:  "The total number of customers who have contracted with the Company for invention development services prior to the last thirty (30) days is 63,859.  The number of customers that have received by virtue of this invention developer's performance, an amount of money in excess of the amount of money paid by the customer to this invention developer is 0."  The disclosures omit any information as to Western InventHelp customers' receipt of licensing agreements, among other omissions, and are thus in violation of the AIPA.

86.      The Preliminary Patentability Search and Opinion Referral Request signed by Geta and Jim Cardiges states that Western InventHelp will "refer you to a patent attorney and you engage the patent attorney to act as your attorney for this work.  We offer this referral to those clients who may not want to locate a patent attorney on their own."  The contract further

states, "If is your responsibility to review the patent attorney's engagement letter and to authorize him to provide preliminary patentability search and opinion services to you" and "You understand that Western InventHelp does not itself perform patent services and cannot give patent advice.  You should contact your patent attorney directly in order to discuss what information is needed in providing patent services to you."

87.    Per that agreement, InventHelp purportedly sent materials on Geta's behalf to Attorney Defendant Frost.  Those materials comprise a one-page description of her proposed invention, hand-written on a paper.

88.    Ms. Miclaus did not have a single meeting with Attorney Defendant Frost in which she described or discussed the particulars of her invention.

89.    Ms. Miclaus did not have a single telephone conversation with Attorney Defendant Frost in which she described or discussed the particulars of her invention.

90.    Ms. Miclaus did not send any materials to Attorney Defendant Frost describing or otherwise assisting with any purported patent search.

91.    In or about October 2017, Ms. Miclaus received her Basic Information Package and Preliminary Patentability Opinion from InventHelp's Pittsburgh address, not Attorney Defendant Frost.

92.    The Preliminary Patentability Opinion is signed by Defendant Thomas Frost and is presented on his letterhead.

93.    Ms. Miclaus was led to believe by InventHelp and the Frost Defendants that the Patentability Opinion was drafted by an objective and independent registered patent attorney. Upon information and belief, Defendant Frost receives all or a substantial percentage of his business from Defendants and is neither independent nor objective.

94.     The Preliminary Patentability Opinion includes a 6-page letter from the Frost

Attorney Defendants dated October 7, 2017.  That letter does not contain a single sentence

describing Ms. Miclaus's invention.  The boilerplate letter merely describes general

considerations of utility patents, design patents, first inventor to file rules, statutory bars, and

other such legal issues generally applicable to any proposed invention.  The letter contains the

statement:  "After careful review of the patent documents discovered during the search, I am of

the opinion that while the broad concept and function of your invention may not be new, your

invention discloses certain novel structural and/or functional features which are neither shown

nor made obvious by any of the patent documents discovered during the search . . . .  Therefore,

in my professional opinion, protection in the form of a utility patent may be available directed to

the specific novel structural or functional features of your invention."

95.     The October 7, 2017 letter from Thomas Frost states, "I want to assure you that

all of the information you have provided for this search, as well as the results thereof as set forth

in writing in this opinion, has been and will continue to be treated as confidential material falling

within the protection provided by the attorney-client privilege."

96.     This letter, and the Thomas Frost P.A. Preliminary Patentability Opinions sent to

all InventHelp customers, are false and misleading.  Mr. Frost did not have the ability to conduct

a proper patent search, and did not do so.  Ms. Miclaus, a non-lawyer, did not know this.

97.     Although purporting to be an end in itself, in truth and in fact the Basic

Information Package and Preliminary Patentability Opinion are part of Defendants' ploy to

convince consumers that their inventions are marketable and/or patentable, and con them into

signing contracts for the more expensive Submission Services.

98.     InventHelp and Mr. Frost did not disclose this to Geta, nor did they disclose that the purpose of their next meeting would not be to review the results, but rather to "upsell" Ms. Miclaus on to another, more costly and involved, package.

99.     Upon information and belief, Patentability Opinions provided to InventHelp customers are not even researched or drafted by Mr. Frost or any other patent attorney.  Instead, upon information and belief, InventHelp (not Mr. Frost) sends the searches to "Above Board Drafting, Inc., a Florida corporation, or another such company.  These outside companies perform the patent searches and draft the 'Patentability Opinions' on Frost Attorney letterhead falsely representing that the Frost Defendants properly prepared the opinions and searches.

100.    Upon information and belief, Defendant Frost had first-hand knowledge of hundreds of customers referred by InventHelp that were informed by Defendant Frost's Preliminary Patentability Opinions that their inventions were eligible to receive patents, but in fact did not receive patents and complained that InventHelp is a fraud.  Mr. Frost, an attorney with a fiduciary duty to Ms. Miclaus, informed her of none of these facts.

101.    On October 25, 2017, Geta met Mr. Cardiges for a second time at InventHelp's Irvine, California office to go over the results of her Basic Information Package report and the Thomas Frost P.A. Preliminary Patentability Opinion.  Mr. Cardiges, a non-lawyer, "explained" the Patentability Report and gave Ms. Miclaus legal advice.

102.    Buoyed by the good news provided to her by Mr. Cardiges, Geta agreed to move forward with Submission Services, and signed a $14,500 Submission Agreement with Western InventHelp.  All "Submission Agreements" with InventHelp and/or Western InventHelp are identical and are governed by the law of the Commonwealth of Pennsylvania.

103.    The Submission Agreement states, "WESTERN INVENTION SUBMISSION CORPORATION (WISC) is the name of the corporation contracting to perform the invention development services.  WISC is operating under its registered name, Western InventHelp.  There are no parent, subsidiary or affiliated companies that will engage in performing invention development services under this Contract except for INVENTION SUBMISSION CORPORATION, an affiliate, and TECHNOSYSTEMS SERVICE CORPORATION, an affiliate.  Company is also affiliated with INTROMARK INCORPORATED, which attempts to market inventions where substantial interest has been expressed in accordance with paragraph 1.N above."

104.    The Submission Agreement states, among other things, that "Western InventHelp will prepare a New Product Submission Brochure, which shall include a description of the invention, benefits and features, a 3D graphic or other illustration in color, Standard Industrial Classification (SIC) codes and suggested distribution channels."

105.    The Submission Agreement states, "Western InventHelp maintains a Data Bank of companies that have registered to receive our clients' submission materials on an ongoing basis. . . .  InventHelp will submit Client's invention, product or idea to Data Bank companies in an attempt to obtain a good faith review as set forth in more detail below."

106.    The Submission Agreement states, "Companies registered in our Data Bank have agreed to review submission materials submitted to them by InventHelp in confidence and have signed confidentiality and non-use agreements."

107.    The Submission Agreement states, "DataBank companies that we have attempted to match with your invention will be sent a copy of Client's New Product Submission Brochure.

This is how Data Bank companies may encounter, receive or see your invention and are then in a position to decide whether to conduct a good faith review."

108.    The Submission Agreement states, "Client agrees that InventHelp shall have the exclusive right to submit the idea, invention or product which is the subject of this Agreement, for the sole purpose of attempting to obtain a good faith review and reviewing any interest expressed including the right to use designs, models, patents issued and pending . . . ."

109.    The Submission Agreement also provides that Western InventHelp would include Geta's invention "in its Virtual Invention Browsing Experience (VIBE) at a trade show we deem suitable."

110.     The Submission Agreement states that "Company's principal business address is:  Western InventHelp 217 Ninth Street, Pittsburgh, Pennsylvania 15222."

111.    Ms. Miclaus also signed an "Intromark Proposal" at the same October 25, 2017 meeting; Jim Cardiges signed both contracts.

112.    Each and every InventHelp Defendant client who signs up for Submission Services also signs an Intromark Proposal; the Intromark Proposals are identical and uniform, stating that they are governed by the laws of the Commonwealth of Pennsylvania.

113.    The Intromark Proposal states:  "Whereas Intromark, Inc. is a Pennsylvania corporation which is engaged in the business of assisting inventors in attempting to market their inventions, products or ideas."

114.    The Intromark Proposal states, "Whereas, Intromark understands that Western InventHelp submits ideas, inventions, and products to industry in an attempt to obtain a good faith review, and that some of these may generate substantial interest such that it will be useful to

attempt to market and to license them; and Western InventHelp does not market or sell inventions."

115.    The Intromark Proposal states, "Western InventHelp shall only submit to Intromark, and Intromark agrees to accept in accordance with this Proposal, inventions, ideas or products in which substantial interest has been expressed, or where Intromark in its discretion believes it would be useful to attempt marketing for the purpose of trying to obtain a sale or licensing agreement."

116.    "The parties agree that Intromark shall have access to all of Client's and Western InventHelp's submission materials and complete files in connection with Intromark's agreement to accept said invention, idea or product for marketing."

117.    The Intromark Proposal states, "Client further agrees that Intromark during the term of this Proposal shall have the exclusive right to negotiate, and to execute contracts on Client's behalf for the sale or licensing of the idea, invention or product."

118.    The Intromark Proposal states, "Intromark will attempt to market Client's idea, invention or product only in the event that substantial interest is expressed in Client's idea.  If a licensing agreement or outright sale results, Intromark shall receive twenty percent (20%) of all royalties paid or of the total sales price paid. . . .  Intromark shall be compensated as stated above, even if the royalties are earned or the sale is made after the termination of this Agreement for any reason."

119.    When she signed the Submission Agreement and Intromark Proposal contracts, Ms. Miclaus was not provided with fulsome or accurate disclosures of, *inter alia*, the number of customers the companies had in the last five years, the number of positive and negative evaluations, the number of customers who received a net profit from inventions, the number of

customers who received license agreements, or the names and addresses of invention promotion companies with whom the companies or their officers were affiliated in the last ten (10) years, among other things.

120.    Ms. Miclaus was not provided with any InventHelp AIPA disclosures whatsoever at the October 25, 2017 meeting.

121.    Ms. Miclaus was not provided with any Intromark Incorporated AIPA disclosures whatsoever at the October 25, 2017 meeting.

122.    Ms. Miclaus was provided with Western InventHelp disclosures at that meeting stating that "The total number of customers who have contracted with Company for Invention development services prior to the last thirty (30) days is 65,666.  The number of customers that have received, by virtue of this invention developer's performance, an amount of money in excess of the amount of money paid by the customer to this invention developer is 0."  This disclosure omits any information as to licensing agreements, among other omissions, and is in violation of the AIPA.

123.    In 2018, Geta began receiving a flurry of mail, all on InventHelp letterhead, representing that it was submitting her information to companies in accordance with their contracts.

124.    Geta was given the impression that InventHelp was working diligently on her behalf.

125.    For example, by letter dated July 19, 2018, InventHelp informed Ms. Miclaus that it had submitted information about her invention to companies on an enclosed list.

126.    By letter dated August 2, 2018, Ms. Miclaus received a letter from InventHelp stating that "Your New Product Submission Brochure was mailed to the companies on the

enclosed report listed as "Data Bank."  Attached to that letter is a list of 25 "Data Bank" companies.

127.    By letter dated October 4, 2018, InventHelp informed Ms. Miclaus that her "invention information is now part of the InventHelp Virtual Trade Show."

128.    By letter dated November 26, 2019, Ms. Miclaus received a letter from InventHelp stating that it had sent her invention to companies on an enclosed list, naming 16 DataBank companies.

129.    Upon information and belief, these lists of DataBank companies, and DataBank company lists sent to all InventHelp customers, are shams.  Some of the companies do not exist and are purposefully misspelled to resemble actual existing companies that have no relationship with InventHelp (for example, listing the company as 'Inc.' instead of 'LLC').  Other "Data Bank" companies claim to have no relationship with InventHelp, and have not signed any confidentiality agreements, or any agreements whatsoever, with InventHelp.

130.    For example, the company "Tamsco Instruments" based in Illinois, is listed as a DataBank company to which InventHelp sent Geta's invention.  However, per the principal of that company, it has no relationship with InventHelp, receives no mail from InventHelp, received no information about Geta's invention from InventHelp, and has never signed any nondisclosure agreement with InventHelp.  Another company on InventHelp's July 23, 2018 list to Geta, "Haven Innovation," also represented that it receives no mail or proposals from InventHelp, and does not have any confidentiality agreement with InventHelp.  Yet another company on that same list, Rinz-L-O Pillow Co., is listed by InventHelp as a Missouri company, but in fact appears to be a company based in the Philippines with no U.S. contact person.  Welland Medical, a company identified as a Vermont-based DataBank entity to which InventHelp sent Geta's idea

in InventHelp's November 26, 2019 letter, has, upon information and belief, been defunct for years.

131.    These are but four examples; an exhaustive survey of InventHelp's DataBank reveals that more than 50% of the companies that InventHelp represents are in its DataBank in fact have no relationship with InventHelp, have never signed nondisclosure agreements with InventHelp, and/or appear to be nonexistent or defunct companies.

132.    Perhaps most disturbingly, some of the entities listed as DataBank companies by InventHelp have in fact agreed to review invention ideas.  However, in the rare instances that these companies express interest in an invention and attempt to contact InventHelp to proceed further, InventHelp does not return the calls.  These companies are provided no contact with InventHelp other than the 1-800 customer numbers advertised to the public on InventHelp's television commercials, and calls to these numbers on behalf of companies and/or individuals that actually want to explore the proposed inventions are not returned.

133.    Upon information and belief, InventHelp has no infrastructure to deal with companies that actually want to proceed with ideas.   Rather, InventHelp's business-profit model is based solely and completely on Submission Services fees and all actions taken by InventHelp are solely in order to maximize its profit by virtue of its receipt of these fees.  InventHelp has no capability or intention to follow up with any outside company that may be interested in a prospective inventor's idea.

134.    Geta did not know this; she trusted InventHelp's representations that it was in fact sending her idea to DataBank companies, that those companies were legitimate, and that those companies had agreed to review InventHelp customers' ideas "in confidence."

135.    InventHelp did not include a proper representation of Geta's invention in its "VIBE" program at trade shows.

136.    From 2017 to date, InventHelp strung Geta Miclaus along, providing her with incomplete and false AIPA disclosures and falsely representing that it was working on her behalf.

137.    Geta, a Registered Nurse currently risking the health and safety of herself and her family by caring for hospitalized COVID-19 patients, spent over $12,000 for InventHelp's worthless, false and fraudulent "services."

138.    Sadly, the experience of Ms. Miclaus is not unique.

139.    In 2017, Plaintiffs Kevin and Vim Byrne, a grocery store manager at "Food For 4 Less" located in Rancho Cucamonga, California, and a stay-at-home mother, respectively, believed that they had an idea for a new invention, "Bonding Double Doll Collection," a two-sided doll that could be customized to represent family members, such as a mother and daughter.

140.    Lured in by InventHelp's television commercials, on July 13, 2017 Mr. and Mrs. Byrne met with InventHelp representative Brian Werner at InventHelp's San Diego, California office.  Mr. Werner expressed extreme excitement over their idea and told them that it carried enormous potential for profit.

141.    On July 13, 2017 Mr. and Mrs. Byrne signed the Basic Information Package Agreement with Western InventHelp and a retail installment contract with "private money lender" Universal Payment Corporation for $760.00.  Mr. Werner signed on behalf of both entities.  The Byrnes' credit card was charged not by Universal Payment Corporation nor Western InventHelp, but by "Techno Inventhelp."

142.    Mr. Werner provided Mr. and Mrs. Byrne purported AIPA disclosures at that meeting on behalf of the entity InventHelp.  Those disclosures state:  "The total number of customers who have contracted with InventHelp in the past 5 years is 10,323.  The total number of customers to have received a net financial profit as a direct result of invention promotion services provided by InventHelp is unknown.  However, the total number of clients known to have received more money than they paid InventHelp for submission services as a direct result of these services is 45.  The total number of customers known by InventHelp to have received license agreements for their inventions as a direct result of InventHelp services is 236."

143.    These disclosure numbers are incomplete, incorrect, false and fraudulent.  Among other things, the disclosure number as to license agreements is false because InventHelp includes sham "60-day license agreements" in those numbers.  Mr. and Mrs. Byrne had no way of knowing this.

144.    Mr. and Mrs. Byrne were not presented with disclosures on behalf of Western InventHelp at this meeting.  However, Mr. Werner gave them the impression that InventHelp and Western InventHelp were one and the same.  Thus, they had no reason to believe that they should have been provided with disclosures from Western InventHelp separate and apart from the InventHelp disclosures.

145.    After signing the Basic Information Package agreement, Mr. and Mrs. Byrne received a call from Mr. Werner in September 2017 informing them that InventHelp was offering a "rare special" that was only available for the next two days, in which they could lock in a low interest rate for Submission Services, thereby saving them thousands of dollars.  They rushed to make an appointment with Mr. Werner in order to take advantage of the purported special.

146.    Mr. and Mrs. Byrne met with Mr. Werner at InventHelp's San Diego offices for a second time on September 25, 2017.

147.    Mr. Werner told them that the results of the Basic Information Package were very promising in light of the large market size for toys, and pressured Mr. and Mrs. Byrne to sign a $11,900 "Submission Agreement" with Western InventHelp.  When they expressed reservations about the extremely high cost of these services, Mr. Werner emphasized that they could just use their existing contract with "private money lender" Universal Payment Corporation to pay off the Submission Agreement and that there was currently a "rare special" that was "about to expire" in two days.  Mr. Werner also said that Paragraph 3 of the Submission Agreement protected them – that if they needed to stop making payments they could do so and InventHelp would have no recourse.

148.    Excited by Mr. Werner's representations, Mr. and Mrs. Byrne signed a "Submission Agreement" with Western InventHelp for $11,900, and an Intromark Proposal at the same time.  Brian Werner signed on behalf of InventHelp, Western InventHelp, Universal Payment Corporation and Intromark.   Those agreements are identical to those signed by all Named Plaintiffs herein and all proposed class members.

149.    At that meeting, the InventHelp Defendants did not inform the Byrnes of the accurate number of customers it had in the last five years, the number of positive and negative evaluations, the accurate number of customers who received a net profit from inventions, the accurate number of customers who received license agreements, or the names and addresses of invention promotion companies with whom InventHelp Defendants or its officers were affiliated in the last ten (10) years.

150.    Mr. and Mrs. Byrne financed the Submission Agreement through their retail installment contract with Universal Payment Corporation, which is identical to that signed by all Named Plaintiffs and proposed class members.

151.    Mr. and Mrs. Byrne were for the first time provided disclosures from Western InventHelp at the September 25, 2017 meeting.  The Western InventHelp disclosures state:  "The total number of customers who have contracted with Company prior to the last 30 days is 63,859. The number of customers that have received, by virtue of this invention developer's performance, an amount of money in excess of the amount of money paid by the customer to this invention promoter is 0."

152.    The Western InventHelp disclosures provided no information whatsoever as to number of license agreements, among other omissions, and thus are *ipso facto* in violation of the AIPA.

153.    To the extent the Western InventHelp disclosure is a stand-alone disclosure, it is in violation of the AIPA because it omits the number of licensing agreements, among other reasons.  To the extent the Western InventHelp disclosure is a supplement to InventHelp disclosures provided to Mr. and Mrs. Byrne at the July 13, 2017 meeting, the disclosures are in violation of the AIPA because their numbers contradict one another.

154.    Mr. and Mrs. Byrne were provided with no AIPA disclosures whatsoever from Intromark Incorporated.

155.    On or about March 20, 2018, Vim Byrne received a call and voicemail from InventHelp's Pittsburgh number, 412-288-1300.

156.    On March 20, 2018, Vim received an email stating:  "Hi Mrs. Byrne  My name is Joe DiResta, I am happy to make your acquaintance.  I left a vm on your phone.  We have a

company who we work with that is willing to give us $500.  To hold the product for 60 days from the time we sign the deal.  This is not a transfer of rights it is a license for them to review the item, please give me a call to discuss.  Please send me an email back to let me know you received this email.  Thanks, Joseph DiResta, "Director of Product Development InventHelp/Intromark O. 412-288-1300 x 1416."

157.    She called Mr. DiResta at the Pittsburgh number and he told her that a company was interested in a "60-day license" of her product and would pay her $500.00, and that this type of short-term license agreement was standard industry practice.

158.    Vim was extremely excited that a company was interested in her invention (which was unpatented and undeveloped), and that the approximately $12,000 that she and her husband had committed to spending was worthwhile.  She relayed the news to her husband.

159.    Later that same day, on March 20, 2018, Vim received another email from "Director of Product Development InventHelp/Intromark" Joe DiResta stating, "Hi!  Nice to speak to you.  As per our conversation.  Please sign and fax or scan back the last/signature page only thank you.  Once we receive your page signed we will reach out to the company for signature.  Once the doc is fully executed and we should receive the funds; when the check clears you will receive the funds.  This is a 30 day process but you can check in at any time thank you.  Also attached is a W-9 to also fill out and return for our accounting dept.  I need both docs filled out and or signed and scanned back or faxed to me before we can redistribute the funds.  Thank you very much, please call my cell if you have any questions!  FAX NUMBER 412-338-0497." The March 20, 2018 emails are attached hereto as **Exhibit C.**

160.    Attached to that March 20, 2018 email are a "60-Day License Agreement" between Intromark Incorporated, Scaddoodle Inc., and Kevin & Vim Byrne and a W-9 tax form. The "License Agreement" and W-9 are attached hereto as **Exhibit D.**

161.    The March 20, 2018 purported 60-Day License Agreement is identical in all material respects to the fraudulent 60-Day License Agreements sent by InventHelp to Plaintiffs Sherry Porter and Cynthia Gray, *Exhibits A and E* to the Second Amended Complaint in *Calhoun v. Invention Submission Corporation et al.*, 18-cv-1022.

162.    The License Agreement sent to Kevin and Vim Byrne states:  "LICENSEE is a 20-year old manufacturer, designer, and developer of aquatic toys, inflatables, adult training sporting goods, assorted sand/beach toys, bikes, banks, plus toys, baby training aids, baby crib attachments, assorted sporting goods, baseball hats and other novelties, with distribution to mass-merchant clients, sporting goods companies, private label and amusement parks markets, and is desirous of obtaining an exclusive license to manufacture, have manufactured, and sell INVENTION in North America and a non-exclusive license to sell INVENTION direct to their other international customers hereinafter referred to as "TERRITORY"). (**Ex. D).**

163.    The License Agreement states:  "LICENSOR hereby grants LICENSEE the exclusive right and license to produce, use, sell and otherwise practice the INVENTION in the TERRITORY, subject to all provisions of the AGREEMENT unless terminated in accordance with any of the provisions hereof, for an initial term ending on May 20, 2018. . . .  If there is no further deal to be had by LICENSEE this contract automatically terminates.  All monies received are the "INVENTOR'S" to keep."  (**Ex. D**).

164.    Upon information and belief, this purported License Agreement is a sham and a scam.

165.    Mr. and Mrs. Byrne were overjoyed that a company was interested in licensing their invention.

166.    On March 21, 2018 Kevin Byrne emailed a signed copy of the License Agreement to JDiresta@ intromark.com.

167.    Mr. DiResta responded:  "Please also send the W9 filled out."

168.    Mr. Byrne then stated via email:  "Hello Joe, We're not sure which box to mark on question 3 on the W-9.  Can you advise us which one applies to us.  Thanks."

169.    Mr. DiResta advised via email on March 21, 2018:  "Send it in and I will ask the accountant and tell you before we check it.  I will not be in office till Monday though."

170.    On March 22, 2018, Kevin and Vim Byrne sent the W-9 to Intromark / InventHelp via email.

171.    Despite repeated requests, they were never provided with a fully executed License Agreement with "Scaddoodle, Inc," nor provided with the name of any person representing that purported Massachusetts corporation.

172.    By email dated April 2, 2018, Joe DiResta, InventHelp/Intromark, emailed Kevin stating, "Kevin I have your check I am sending it out today!"

173.    Shortly thereafter, Mr. and Mrs. Vim received a $500 check in the mail.  The check is dated April 2, 2018, and is from Intromark, Inc., 217 Ninth Street, Pittsburgh, Pa.  It bears the memo notation SBD 1294 – ADVANCE ROYALTY, and was signed by Defendant Robert J. Susa.

174.    Time passed, and Mr. and Mrs. Byrne reached out to InventHelp to inquire about the status of the deal; Mr. DiResta first dodged their calls and eventually informed them that

"Scaddoodle, Inc" decided not to renew the 60-day license, but that luckily, the $500 was theirs to keep.

175.    In late 2018, Mr. Byrne received a Form 1099 from Intromark, indicating a payment of $500.00, characterized as "Royalties."

176.    Mr. and Mrs. Byrne never heard from Joe DiResta again.

177.    Upon information and belief, the purported License Agreement with Scaddoodle Inc. is a fake.  InventHelp routinely uses sham "60-Day License Agreements" and $500.00 checks like those sent to the Byrnes, as well as the plaintiffs in *Calhoun v. Invention Submission Corporation el al.,* 18-cv-1022, to falsify its AIPA disclosures regarding the number of InventHelp clients who received license agreements by virtue of InventHelp's services.

178.    Defendant Robert J. Susa signs all of the fraudulent $500 checks, with full knowledge that they are not in exchange for purported "60-day license agreements," but rather that they are used to falsify InventHelp's AIPA disclosures.

179.    These are not real license agreements, and the companies on whose behalf they are sent are not real – Mr. Susa, the President of all InventHelp Defendants named herein, has full knowledge of this fact.

180.    Indeed, Defendant Robert J. Susa is intimately involved in InventHelp's fraud at all levels.  For example, InventHelp refers its clients to several patent attorney firms located throughout the United States, including the now-defunct firm Crossley & Stevenson.  These patent attorneys apply for utility or design patents on InventHelp customers' behalf.

181.    In or about late 2016, one such attorney, Tarley G. Stevenson, learned that InventHelp and her law partner, Patricia K. Crossley, were engaging in fraud.

182.    As a result, attorney Tarley G. Stevenson sought to file a lawsuit and dissolve her partnership with Patricia Crossley and InventHelp.

183.    Upon learning this, Defendant Robert J. Susa personally called Ms. Stevenson and repeatedly threatened and harassed her, pressuring her to cover up the fraud.  Mr. Susa also repeatedly threatened Ms. Stevenson that if she used InventHelp's name in any lawsuit or filing he would sue her for defamation.

184.    Attached hereto as **Exhibit E** is an email dated August 28, 2018 from Tarley Stevenson characterizing InventHelp as a "deceitful, despicable company" and stating that "Bob Susa and his attorney at Fox Rothschild not only meddled in the lawsuit, but asked me to cover up the close to $1M in fraud that my partner was responsible for . . . as a result of black-lining federal documents and correspondence to clients. . . . "

185.    In the Spring of 2018, Ms. Stevenson wrote a letter to Mr. Susa memorializing her understanding of InventHelp's fraud vis-à-vis the patent attorneys with whom InventHelp works. Among other things, she complained about the patent attorneys' lack of independence.  She also opined that the Thomas Frost Preliminary Patentability Opinions and searches "are an absolute sham."  Mr. Susa personally responded with threats to Ms. Stevenson and her law practice.

186.    In the meantime, Mr. and Mrs. Byrne were regularly receiving letters on InventHelp letterhead representing that InventHelp had sent their idea to DataBank Companies, which had signed confidentiality agreements.

187.    Kevin and Vim Byrne believed, and were led to believe, that InventHelp was diligently working on their behalf.

188.    However, many of these DataBank companies do not exist, did not sign nondisclosure agreements, and/or do not have any relationship with InventHelp.

189.    For example, by letter dated March 29, 2018, InventHelp sent the Byrnes a purported DataBank list naming the Missouri company "Ozark Mountain Kids" as one DataBank company to which InventHelp sent their idea.  Per the owner of that company, it has no relationship with InventHelp, never had any relationship with InventHelp, never signed any nondisclosure agreement with InventHelp and never received any information about the Byrnes' invention from InventHelp.

190.    The principal of "RB Toy Design, Inc." located in Illinois, also identified as a DataBank company in InventHelp's March 29, 2018 letter to the Byrnes, represented that he never agreed to be a part of InventHelp's purported DataBank, never received information about the Byrnes' invention, and that instead he just "ended up on a list."

191.    A third company on the March 29, 2918 list, Gann Memorials LLC, receives unsolicited materials from InventHelp, but has no relationship with InventHelp and has never signed any nondisclosure agreement with InventHelp.  The principal of that company has repeatedly told InventHelp to take it off of its list, but he continues to receive from InventHelp what he terms, "junk mail."

192.    By letters dated January 18, 2019, March 22, 2019, and September 20, 2019, InventHelp sent the Byrnes more letters enclosing lists of "DataBank" companies to which InventHelp purportedly sent their idea.  These lists contain companies that do not appear to exist, claim to have no relationship with InventHelp, and/or have never signed nondisclosure agreements with InventHelp.  For example, a company listed on the list enclosed with the September 20, 2019 letter is identified as "Moose Mountain."  It does not exist as an independent entity; its parent company is publicly-traded entity JAKKS Pacific, Inc., which does not accept concept submissions as a matter of company policy.  Similarly, the Washington company The

Toysmith Group, listed on a March 22, 2019 letter from InventHelp to the Byrnes, does not accept product submissions as a matter of company policy.

193.     Mr. and Mrs. Byrnes trusted the representations made by InventHelp and did not know these facts.

194.     The Byrnes believed, and were led to believe, that InventHelp was diligently working on their behalf and that such efforts had the potential to lead to licensing or manufacturing agreements.  In truth, this is not the case.

195.     From July 2017 to date, InventHelp strung Mr. and Mrs. Byrnes along, providing them with incomplete and false AIPA disclosures, falsely representing that it was working on their behalf, even going so far as to present them with a sham licensing agreement and a check signed by Defendant Susa for $500, fraudulently representing that it was in exchange for a "60-day license" of their undeveloped, unpatented idea.

196.     Kevin Byrnes works full time as a grocery store manager thereby putting him on the front lines of the COVID-19 crisis, and he goes to work every day risking the health of himself, his wife Vim and their daughter.  The Byrnes financed their InventHelp contracts through Universal Payment Corporation.  Last year, they could no longer make the onerous monthly payments; the InventHelp Defendants first repeatedly harassed the Byrnes in order to convince them to keep paying.  When that did not work, the InventHelp Defendants reported the Byrnes to a credit agency thereby lowering their credit rating.  This caused them significant hardship and thus they ultimately paid off the Universal Payment Corporation contract so that they could restore their credit and get on with their lives.  The Byrnes paid the InventHelp Defendants over $12,000 for worthless, false and fraudulent services.

197.    In sum, all "efforts" made on Plaintiffs' behalf by Defendants are lies and scams. Defendants, contrary to their written and verbal representations, have no meaningful interest or investment in fulfilling their contractual promises; rather, their business model is based upon receipt of Submission Service fees, and nothing more.  Moreover, the AIPA statutorily-mandated disclosures presented to Plaintiffs herein are inaccurate, misleading, and fraudulent.

198.    Attached hereto as **Exhibit A** is a screenshot of an online video advertisement sent by InventHelp to all Plaintiffs herein and available for viewing by the public at large.  That advertisement states:  "More than 8,000 Companies in the InventHelp DataBank."  The advertisement then flashes the names and logos of dozens of reputable and well-known companies, such as Cabela's, Toro, Heinz, waterpik, Elmer's Glue, Kraft, Clorox, Bosch, among others.  The message conveyed by this advertisement is false, ambiguous and deceptive because, among other things, InventHelp has no relationship with these entities (including the fact that they are not registered in InventHelp's DataBank) and no InventHelp client who may have worked with any of these entities did so by virtue of InventHelp's so-called Submission Services.

199.    Attached hereto as **Exhibit B** is a screenshot of an online advertisement sent by InventHelp to all Plaintiffs and available for viewing by the public at large.  The advertisement states:  "InventHelp's Inpex Product Searches" and then flashes the names and logos of various well-known companies, including "Tupperware," Rubbermaid," "green works," Glad," "Tilex," Kraft," Elmers," Walmart," "K-Mart," Autozone," "Mucinex," Woolite," and "Clearasil," among others.   The message conveyed by this advertisement is false, ambiguous and deceptive because, among other things, InventHelp has no relationship with these entities (including the fact that they are not registered in InventHelp's DataBank) and no InventHelp client who may have worked with these entities did so by virtue of InventHelp's so-called Submission Services.

200.    Upon information and belief, Defendants' acts have the same or similar purposes and results *(i.e.* carry out a scheme to defraud Plaintiff and Class Members of money), participants *(i.e.* Defendants), victims *(i.e.* the Plaintiff and Class Members), methods of commission *(i.e.* using television, telephone, in-person meetings, mail and internet networks to falsely represent to Plaintiffs and Class Members that the inventions were patentable, profitable and that Defendants' were fulfilling their contractual and statutory obligations), and are not isolated events.

201.    Upon information and belief, the acts described herein amount to continued criminal and fraudulent activity and were committed by Defendants in furtherance of their continuing scheme to defraud Plaintiffs and Class Members.

202.    Moreover, the scheme described herein is a continuing operation and poses the threat of continued criminal and fraudulent activity, preying upon unsuspecting victims. Defendants' websites and television commercials continue to tout their invention promotion services to lure potential inventors to enter into contracts with Defendants for fraudulent invention promotion services.

203.    Defendants defrauded other victims before, during and after they defrauded Plaintiffs. The foregoing demonstrates that there is no obvious terminating goal or date for the fraudulent activity; the foregoing acts are part of the Defendants' ongoing, regular way of doing business; and Defendants operate a long-term association that exists for criminal purposes *(e.g.,* fraudulently inducing potential inventors to enter into contracts that obligate the inventors to pay money to Defendants).

204.    Defendants' conduct employs the use of the public telephone, television, U.S. mail, and internet networks.

205.     The injuries to Plaintiffs and the members of the class were caused by Defendants' scheme of fraudulently inducing Plaintiffs and Class Members, through false disclosures, false promises, misrepresentations, and omissions, to enter into contractual agreements.

206.     The injuries to Plaintiffs and potential class members are ongoing – InventHelp has publicly disseminated Plaintiffs' invention ideas, thereby putting them in the public realm and impacting potential patentability and profitability for Plaintiffs.

207.     Furthermore, many of the misrepresentations and omissions alleged herein are contained on Defendant's websites.

## CLASS ACTION ALLEGATIONS

208.     Plaintiffs bring this suit individually and as a class pursuant to Federal Rule of Civil Procedure 23, the requirements of such are met with respect to the class as defined below.

209.     The Class consists of: All persons and entities in the United States and abroad who purchased goods and/or services from Defendants from 2010 to present.

210.     Subject to additional information obtained through further investigation and discovery, Plaintiffs reserve the right to expand, narrow, or otherwise refine the foregoing definition.

211.     Excluded from the Class are Defendants; any parent, subsidiary, or affiliate of Defendants; any entity in which any Defendant has or had a controlling interest or which Defendants otherwise control or controlled; any officer, director, legal representative, predecessor, successor, or assignee of a Defendant.

212.     This action is properly maintainable as a class action.

213.    The Class is so numerous that joinder of all individual members in one action would be impracticable.  InventHelp disclosures accompanying Submission Agreements signed in 2018 obtained from potential Class Members state, "the total number of customers who have contracted with InventHelp in the past 10 years is 10,272."  Submission Agreements signed in 2018 from potential Class Members state, "from 2015-2017, we signed submission agreements with 6,564 clients." The exact number of class members can be determined by appropriate discovery.

214.    Plaintiffs' claims are typical of the claims of the Class Members in that they all signed identical contracts with Defendants and paid for the same services from Defendants. Class members were all injured by the same wrongful conduct, namely, receipt of incomplete, false and misleading AIPA disclosures, Defendants' breach of uniform contracts, Defendants' false representations as to its DataBank, and fraudulent course of conduct and policy.  The violations of the statutory and common laws and the relief sought herein are common to Plaintiffs and the members of the class.

215.    There are questions of fact and law common to all Class Members that predominate over questions which may affect individual members. These include the following:

a.  Whether the disclosures set forth in Defendants' contracts and other paperwork and advertisements, which are identical and uniform, are complete, truthful and in compliance with the American Inventors Protection Act of 1999, 53 U.S.C.A. § 297;

b.  Whether Defendants violated the AIPA by making uniform material fraudulent representations or omissions of material facts, including as to its DataBank;

c.  Whether Defendants improperly and deceptively represent that InventHelp has relationships and/or dealt with the entities pictured on **Exhibits A** and **B**, among others;

d.  Whether Defendants breached their contracts, which are identical and uniform in form and substance, with Plaintiffs and Class Members;

e.  Whether Defendants' acts as described herein constitute the unauthorized practice of law;

f.  Whether the Frost Attorney Defendants violated their fiduciary duties to recipients of Preliminary Patentability Opinions;

g.  Whether Defendants' acts described herein constitute a mode and practice that pervades the entire company and/or enterprise, including promulgating policies and/or instruction to use common practices;

h.  Whether Defendants' business model, which is uniformly applied and directed to all of their customers, is in fact geared toward and/or effective in helping consumers market and/or profit from their inventions, as Defendants claim;

i.  Whether Defendants made false and/or misleading statements to the Class and the public at large concerning the legitimacy of their goods and services;

j.  Whether Defendants are responsible for the conduct alleged herein, which was and is uniformly directed at all consumers who purchased Defendants' products and services;

k.  Whether Defendants had a pattern or practice of making fraudulent and false representations to consumers in order to induce them to sign contracts;

l.   Whether Defendants had a pattern or practice of making fraudulent and false representations to consumers regarding whether consumers' ideas were likely to be patentable and/or profitable;

m.  Whether Defendants engaged in a conspiracy to work in concert to defraud Plaintiff and Class members;

n.   Whether Plaintiffs and the Class have sustained damages and, if so, the proper measure thereof; and

o.   Whether Defendants should be enjoined from the actions described herein.

216.    Plaintiffs are adequate Class Representatives because their interests do not conflict with the interest of the Class Members; their claims are common to all members of the Class and are based upon the same facts (practice or course of conduct) undertaken by Defendants' with respect to all Class Members and are based upon the same legal theories; Plaintiffs have strong interests in vindicating their rights.  The Class Members' interests will be fairly and adequately protected by Plaintiffs and counsel.  Defendants have acted in a manner generally applicable to the Class, making relief appropriate with respect to Plaintiff and the Class Members.

217.    Plaintiffs have retained counsel experienced and competent in the prosecution of complex class action litigation and have been engaged and intend to continue to vigorously prosecute this action.  Plaintiffs and their attorneys are familiar with the subject matter of this action and have already expended substantial hours ascertaining and investigating the allegations herein.

218.    A class action is superior to other available means for the fair and efficient adjudication of the claims of the class members. Common issues of law and fact predominate, as

the primary focus is Defendants' false and incomplete AIPA disclosures, uniform deceptive and misleading practices regarding its purported DataBank, and uniform breach of identical contracts.

219.    The proposed class is (i) the surest way to fairly and expeditiously compensate so large a number of injured persons that constitute the class; (ii) to keep the courts from being inundated by thousands of repetitive cases; and (iii) to reduce transaction costs so that the injured class members can obtain the most compensation possible.  Accordingly, class treatment presents a superior mechanism for fairly resolving similar issues and claims without repetitious wasteful litigation.

220.    Importantly, most individual Class Members here lack resources to undertake the burden and expense of individual prosecution of these claims.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. It also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.

221.    Without a class action, Defendants will likely retain the benefit of their wrongdoing and will continue a course of action which will result in further damages to Plaintiff and class members.

222.    The scheme described herein is a continuing operation and poses the threat of continued fraudulent activity, preying upon unsuspecting victims. Defendants' websites and television commercials continue to tout their invention promotion services and falsely represent

affiliation with companies in order to lure potential inventors to enter into contracts with

Defendants for fraudulent invention promotion services.

## CLAIMS FOR RELIEF

### COUNT I
**Against InventHelp Defendants**
**(Violation of the American Inventors Protection Act of 1999, 35 U.S.C. § 297)**

223.    Plaintiffs reallege and incorporate herein by reference each and every foregoing

paragraph of this Complaint as if set forth in full.

224.    Defendants are invention promoters, officers, and their agents, as defined by the

American Inventors Protection Act of 1999, 35 U.S.C. § 297 ("AIPA").  Defendants work in

concert to perpetrate this scheme.

225.    The "Basic Information Package Agreements," "Submission Agreements,"

"Intromark Proposals," and other contracts described herein are contracts for invention

promotion services as defined by the AIPA.

226.    Plaintiffs and Class Members are customers as defined by the AIPA.

227.    Defendants contracted with Plaintiffs and Class Members to provide them with

invention promotion services as defined by the AIPA.

228.    Defendants violated the AIPA by not providing the proper disclosures to Plaintiff

and Class Members prior to entering into contracts for invention promotion services.

229.    Plaintiffs were not provided with complete and accurate disclosures of, *inter alia*,

the number of customers Defendants had in the last five years, the number of positive and

negative evaluations, the accurate number of customers who received a net profit from

inventions, the number of customers who received license agreements, or the names and

addresses of invention promotion companies with whom Defendants or their officers were affiliated in the last ten (10) years.

230.    As detailed *supra*, Defendants' purported disclosures are incomplete, inaccurate, internally inconsistent, blatantly false, and fraudulent.  In addition to the omissions and the sham licensing agreements explained herein, discovery will unearth additional facts and practices that render Defendants' AIPA disclosures incomplete, false and misleading.

231.    As detailed *supra*, Defendants do not provide Plaintiffs and Class Members with the full array of AIPA-mandated disclosures, omitting statutorily-mandated information as to licensing agreements, among other things.

232.    Defendants file false and fraudulent tax documents with the U.S. Federal government, representing that clients received licensing agreements, when, in truth and in fact, these purported "60-day licenses" are concocted solely for the purpose of bolstering InventHelp's AIPA disclosures – InventHelp includes the sham "60-day licenses" in their AIPA numbers, thereby falsely representing to existing and potential clients the number of InventHelp customers who received licensing agreements.  Discovery will unearth additional facts showing that Defendants' AIPA disclosures are false and fraudulent.

233.    The implementation, publication, and dissemination of Defendants' invention promotion, patent, manufacturing, licensing and consultation services has been, and continues to be, materially misleading and deceptive to members of the Class and to Plaintiffs in material respects.

234.    Defendants' material misrepresentations were and are substantially uniform in content, presentation and impact.

235.    Defendants make material misrepresentations and omissions concerning its purported DataBank of companies, including the improper identification of companies included in the DataBank (*see* **Exhibits A & B),** that all companies included in the DataBank have signed confidentiality agreements with InventHelp, that all companies included in the DataBank in fact exist, that sending descriptions of InventHelp customers' proposed inventions to companies on the DataBank list is a legitimate and useful mechanism for customers seeking a review of and/or to market their inventions, and that consumers' proposed inventions will be displayed at INPEX trade shows, when, in truth and in fact, many DataBank companies do not exist, do not have relationships with Defendants, did not sign nondisclosure agreements, and/or are not appropriate companies to manufacture, license and/or market Plaintiff consumers' proposed inventions. Defendants are not affiliated with Carnegie Mellon University and other such reputable institutions and brands, and consumers' inventions are not, in fact, presented and/or displayed at INPEX.

236.    Defendants' acts and practices are likely to confuse or mislead consumers acting reasonably under the circumstances into believing that the Defendants are a legitimate enterprise, that Defendants have relationships with the companies and products listed on **Exhibits A and B,** among others, and that Defendants' services are tailored to help inventors obtain reviews of and/or monetize their inventions.  In truth and in fact, Defendants' services are tailored to extract as much money from Plaintiffs as possible, have little to no utility for Plaintiffs, and are in fact a fraud.

237.    By reason of the foregoing, Defendants are liable to Plaintiff and the Class for actual damages and statutory trebling of those damages, together with punitive damages, attorneys' fees, costs, and interest.

## COUNT II
### Against All Defendants
### (Fraud)

238.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

239.    Fraud permeates all of the dealings and contracts between Class Plaintiffs and all Defendants herein, from start to finish.

240.    The agreements and contracts signed by Class Plaintiffs are part and parcel of a grand fraudulent scheme perpetrated by Defendants.

241.    Defendants made and continue to make false and fraudulent statements (including false and misleading disclosures in their contracts and published materials), false promises, misleading representations, and omitting material facts to Plaintiff and Class members pertaining to the uniqueness, patentability, and profitability, among other things, of their inventions, as set forth above.  These representations are part of Defendants' overall business practices and are substantially identical and uniform.

242.    Throughout the course of dealings between Plaintiffs and Defendants, Defendants make many blatant misrepresentations and omissions of present fact, including that certain external companies are interested in Plaintiffs' inventions, when those companies do not exist or have not in fact expressed interest; that Defendants have relationships with "DataBank" companies; that Defendants have performed proper patent searches; that Defendants believe that consumers' proposed inventions are likely to make a profit; and that Defendants' submission services have led to licensing agreements and/or profits for consumers, among other things.

243.    Defendants fraudulently misrepresent the actual content of the contracts between Defendants and Class Plaintiffs, thereby tricking Class Plaintiffs into signing documents that state different terms and conditions than those represented by Defendants.

244.    Defendants also falsely represent verbally that their services will likely result in financial gain for consumers in order to induce Plaintiffs to sign the various contracts at issue, when, in truth and in fact, Defendants do not believe this to be the case, and, upon information and belief, Defendants have often seen these very same inventions before.

245.    Defendants falsely represent that they will undertake certain services on consumers' behalf, including but not limited to marketing and promotion of Plaintiffs' proposed inventions.  In truth and in fact, Defendants do none of these things.

246.    Defendants falsely represent themselves to be independent of one another, but they are part and parcel of a single, grand scheme.

247.    Defendants made many other material misrepresentations to and concealed or suppressed material facts from Class Plaintiffs, as described herein, among other things.

248.    Defendants knew or believed these material misrepresentations and omissions to be false, or made them with reckless regard for the truth.

249.    Defendants misrepresented, concealed or suppressed these facts with the intent to defraud Class Plaintiffs.

250.    Class Plaintiffs were reasonable in relying on Defendants' misrepresentations and omissions of material facts because, among other reasons, Defendants advertised and held themselves out to be credible, legitimate and experienced sellers of invention promotion, manufacturing, distribution, and other such services, and as having extensive knowledge and expertise in bringing new inventions to fruition, and as independent attorneys.

251.    At the time Class Plaintiffs acted, they were unaware of the false, concealed and/or suppressed facts and would not have purchased Defendants' goods and services had they known the true facts.

252.    Class Plaintiffs have been injured by virtue of Defendants' false and misleading representation that they have relationships with, are affiliated with, or otherwise have had business relationships with DataBank companies and other reputable entities, including those listed on **Exhibits A and B** hereto.  Plaintiffs and class members did not and do not pursue development and/or monetization of their inventions aside from their association with InventHelp because they were and are under the false impression that InventHelp was and is doing so for them.

253.    Class Plaintiffs have been injured by loss of patentability and/or marketability of their inventions by virtue of InventHelp's publicizing of Class Plaintiffs' ideas and proposed inventions to companies that have not signed nondisclosure agreements, among other things.

254.    All Defendants are liable for the tortious conduct of the other Defendants, as they (a) performed the tortious acts in concert with the others and pursuant to a common design with them, (b) knew that the other Defendants' conduct constituted tortious conduct and gave substantial assistance or encouragement to the other Defendants, and (c) gave substantial assistance to the other Defendants in accomplishing the tortious result and their own conduct, separately considered, constituted tortious conduct towards Plaintiff and Class members.

255.    As a direct and proximate result of Defendants' misrepresentations and concealment of material facts, Class Plaintiffs have suffered damages, the precise amount to be determined at trial.

256.    Defendants' misconduct described herein was intentional, willful, malicious, and in blatant disregard of, or grossly negligent and reckless with respect to, Plaintiffs and the other members of the Class.  Defendants are therefore additionally liable for treble and punitive damages, in an amount to be determined at trial, as well as attorneys' fees and costs.

**COUNT III**
**Against All Defendants**
**(Negligent Misrepresentation)**

257.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

258.    Defendants made misrepresentations and other statements in connection with their deceptive invention promotion, patent, manufacturing, licensing and consultation services.

259.    Defendants made these representations while in privity of contract with Plaintiffs.

260.    The misrepresentations were and are false, deceptive and misleading at the time they were made.

261.    Upon information and belief, at the time they were made, Defendants knew that the statements were false, deceptive and misleading.

262.    Upon information and belief, Defendants stated, disseminated, published and advertised the misrepresentations with the intent to deceive and defraud the general public, including Class Plaintiffs.

263.    Class Plaintiffs were unaware of the falsity of the misrepresentations and relied upon the misrepresentations and as a result have been defrauded out of large sums of money.

264.    Defendants' misconduct described herein was intentional, willful, malicious, and in blatant disregard of, or grossly negligent and reckless with respect to, Plaintiffs and the other members of the Class.  Defendants are therefore additionally liable for treble and punitive damages, in an amount to be determined at trial, as well as attorneys' fees and costs.

<u>**COUNT IV**</u>
**Against All Defendants *excluding* Robert J. Susa**
**(Breach of Contract)**

265.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

266.    Defendants and Plaintiffs and members of the Class entered into various contracts which are uniform in form and content.

267.    Defendants failed to fulfill the obligations set forth in the above-referenced contracts, thereby breaching their respective contracts with Plaintiffs, and Plaintiffs suffered ascertainable loss as a direct and proximate result of Defendants' actions, and have been damaged thereby.

268.    Defendants executed identical contracts with all Class Plaintiffs and failed to fulfill their obligations set forth in those contracts, damaging Class Plaintiffs.

269.    Every contract contains an implied covenant of good faith and fair dealing in the performance and enforcement of the contract.  The implied covenant is an independent duty and may be breached even if there is no breach of the contract's express terms.

270.    Under the contracts described herein, Plaintiffs and Class Members reasonably expected Defendants to carry out the covenants set forth in those contracts.

271.    Defendants arbitrarily and unreasonably did not fulfill the various covenants set forth in the contracts, even though they in fact represented to Plaintiffs and Class Members that they would make best efforts to do so.

272.    Defendants acted in bad faith.

273.     By reason of the foregoing, Defendants are liable to Plaintiffs and members of the Class for the damages they have suffered as a result of Defendants' actions, the amount of such damages to be determined at trial, plus punitive damages, attorneys' fees and costs.

## COUNT V
### Against Frost Attorney Defendants
### (Unjust Enrichment)

274.     Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

275.     Defendants' conduct as described herein allowed Defendants to knowingly realize substantial revenues from selling their goods and services at the expense of, and to the detriment or impoverishment of, Class Plaintiffs, and to Defendants' benefit and enrichment.  Defendants have thereby violated fundamental principles of justice, equity and good conscience.

276.     Class Plaintiffs conferred significant financial benefits and paid substantial compensation to Defendants.

277.     It is inequitable for Defendants to retain the benefits conferred by Class Plaintiffs.

278.     By reason of the foregoing, Defendants are liable to Plaintiffs and members of the Class for the damages they suffered as a result of Defendants' actions, the amount of which shall be determined at trial, plus attorneys' fees.

279.     Defendants' misconduct described herein was intentional, willful, malicious, and in blatant disregard of, or grossly negligent and reckless with respect to, Plaintiffs and the other members of the Class.  Defendants are therefore additionally liable for treble and punitive damages, in an amount to be determined at trial, as well as attorneys' fees and costs.

## COUNT VI
### Against Frost Attorney Defendants
### (Breach of Fiduciary Duty)

280.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

281.    The Frost Attorney Defendants owe Class Plaintiffs fiduciary duties, including advising and acting in Class Plaintiffs' best interests.

282.    Defendants' "Preliminary Patentability Opinions" are an integral part of the fraudulent conspiracy.

283.    The Frost Attorney Defendants provide services to Class Plaintiffs under the guise that these defendants are independent and impartial, when, in fact, they are not.

284.    The Attorney Defendants breached their fiduciary duties of care by, among other things, conducting incomplete patent searches, advising Class Plaintiffs to apply for patents even though Attorney Defendants were aware that Class Plaintiffs' idea were not suitable for patents for various reasons.  The Frost Attorney Defendants also had first-hand knowledge of hundreds (or thousands) of customers, referred to them by InventHelp, who did not receive utility patents and/or complained that InventHelp is a fraud.  The Frost Attorney Defendants also allowed and/or directed the InventHelp Defendants to give legal advice related to, explain and opine upon the Preliminary Patentability Opinions, knowing that it was improper for the non-attorney InventHelp Defendants to do so.  Yet, they informed Class Plaintiffs of none of these facts.

285.    Attorney Frost rarely spoke or met with consumers to discuss their proposed inventions, instead signing boilerplate 'Patentability Opinions' without a formal engagement letter or any discussion whatsoever about the searches he was allegedly conducting.

286.    Class Plaintiffs have been damaged by The Frost Attorney Defendants' breaches of their fiduciary duties.

287.    Defendants' misconduct described herein was intentional, willful, malicious, and in blatant disregard of, or grossly negligent and reckless with respect to, Plaintiffs and the other members of the Class.  Defendants are therefore additionally liable for treble and punitive damages, in an amount to be determined at trial, as well as attorneys' fees and costs.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

**WHEREFORE**, Plaintiffs, on behalf themselves and the Class, pray that the Court:

(a) Enter an Order certifying the Class as defined above, appointing the Plaintiffs as Class Representatives, and designating their Attorneys as Class Counsel, and issuing a Declaration that Defendants are financially responsible for issuing appropriate Notice to the Class;

(b) Enter an Order finding that Defendants have committed the violations of statutory and common law alleged herein;

(c) Enter an Order granting monetary relief, including treble and punitive damages on behalf of the Class, the precise amount of which is to be determined at trial;

(d) Enter an Order granting monetary relief, including compensatory damages on behalf of the Class, the precise amount of which is to be determined at trial;

(e) Enter an Order awarding restitution;

(f) Enter an Order granting all appropriate relief on behalf of the Class under the applicable statutory and common laws;

(g) Enter an Order awarding interest on the monies wrongfully obtained beginning from the date of collection;

(h) Enter an Order awarding costs, reasonable attorneys' fees, and expenses incurred in connection with the commencement and prosecution of this action;

(i) Entering declaratory and injunctive relief against Defendants, including directing Defendants to correct their practices and to comply with the AIPA and to take measures to correct the damage to Plaintiffs' credit scores by reason of Defendants' actions described herein; and

(j) Granting such other and further relief as the Court may deem just and proper.

Dated: White Plains, New York
May 7, 2020

**OXMAN LAW GROUP, PLLC**

By: _____/s/ Julie Pechersky Plitt_____
JULIE PECHERSKY PLITT
Bar #: JP8607

Marc S. Oxman
Julie Pechersky Plitt
**Oxman Law Group PLLC**
120 Bloomingdale Road, Suite 100
White Plains, New York 10605
(914) 422-3900
(914) 422-3636 (Fax)
jplitt@oxmanlaw.com

Ira M. Press
Andrew M. McNeela
Karina Kosharskyy
**Kirby McInerney LLP**
250 Park Avenue, Suite 820
New York, New York 10177
ipress@kmllp.com
amcneela@kmllp.com
kkosharskyy@kmllp.com

Stanley W. Greenfield, Esq.
Greenfield and Kraut
1040 Fifth Avenue
Pittsburgh, PA 15219
(412) 261-4466
greenfieldandkraut@verizon.net

*Attorneys for Plaintiffs*