# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Etta Calhoun, Sherry Porter, and Cynthia Gray, on behalf of themselves and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Invention Submission Corporation d/b/a InventHelp, Technosystems Consolidated Corp., Technosystems Service Corp., Western Invention Submission Corp., Universal Payment Corporation, Intromark Incorporated, Robert J. Susa, Thomas Frost, P.A., Thomas Frost, John Doe Companies 1-10, John Doe Individuals 1-10,<br>Defendants. | No. 2:18-cv-01022<br><br>Judge Cathy Bissoon<br><br>Magistrate Judge Patricia L. Dodge |
| Carla Austin and Nil Leone, individually and on behalf of all other persons similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Invention Submission Corporation d/b/a InventHelp, Western Invention Submission d/b/a Western InventHelp,<br><br>Defendants. | No. 2:19-cv-01396<br><br>Judge Cathy Bissoon<br><br>Magistrate Judge Patricia L. Dodge |

| | |
|---|---|
| Geta Miclaus, and Vim and Kevin Byrne, on behalf of themselves and all other persons similarly situated, | No. 2:20-cv-681 |
| Plaintiffs, | Judge Cathy Bissoon |
| v. | Magistrate Judge Patricia L. Dodge |
| Invention Submission Corporation d/b/a InventHelp, Technosystems Consolidated Corp., Technosystems Service Corp., Western Invention Submission Corp. d/b/a Western InventHelp, Universal Payment Corporation, Intromark Incorporated, Robert J. Susa, Thomas Frost, P.A., Thomas Frost, John Doe Companies 1-10, John Doe Individuals 1-10, | |
| Defendants. | |

## *CALHOUN* PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO CONSOLIDATE AND APPOINT THE OXMAN LAW GROUP AS INTERIM LEAD COUNSEL AND IN OPPOSITION TO THE MOTIONS OF BERGER MONTAGUE

# TABLE OF CONTENTS

Page No.

TABLE OF AUTHORITIES ..........................................................................................(ii)

PRELIMINARY STATEMENT .......................................................................................1

BACKGROUND ...........................................................................................................5

   A. The *Calhoun* and *Miclaus* Actions .......................................................................5

   B. The Later-Filed Copy-Cat *Austin* Action...........................................................7
   C. BM's Deceptive Solicitations................................................................................8
   D. InventHelp Defendants' Silence Regarding Its and BM's Machinations ............8
   E. BM's Lies About Kirby's Withdrawal..................................................................9
   F. BM's Lies About Oxman's Participation in the Mediation ...............................14

ARGUMENT ..............................................................................................................16

I.  CONSOLIDATION FOR PRETRIAL PROCEEDINGS IS APPROPRIATE .......................16
II.  OXMAN IS BEST SUITED TO ACT AS INTERIM LEAD COUNSEL
   BECAUSE IT WILL MOST ADEQUATELY REPRESENT THE CLASS AND MOST
   EFFICIENTLY PROSECUTE THE CLAIMS ....................................................................18

   A. The 23(g) Factors Weigh in Favor of Oxman....................................................19

      1. Counsel's Work in Identifying and Investigating the Claims......................................19
      2. Counsel's Experience and Substantive Knowledge of Claims
         of the Type Asserted in this Litigation and Class Actions Generally ..........................20

      3. Oxman Has Committed Substantial Resources To Prosecute this Litigation..............22
      4. The Discretionary Factors of Rule 23(g) Support Appointing Oxman as
         Interim Lead Class Counsel..........................................................................................22

III. ALTERNATIVELY, THE COURT NEED NOT APPOINT INTERIM
   LEAD COUNSEL AT THIS TIME ................................................................................24

CONCLUSION............................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bodner v. Oreck Direct, LLC,*
2007 WL 1223777 (N.D. Cal. April 25, 2007) ................................................................... 22

*Creative Montessori Learning Centers v. Ashford Gear LLC,*
662 F.3d 913 (7th Cir. 2011) ........................................................................................ *passim*

*Eubank v. Pella Corp.,*
753 F.3d 718 (7th Cir. 2014) ................................................................................................. 5

*Friedman-Katz v. Lindt & Sprungli (USA), Inc.,*
270 F.R.D. 150 (S.D.N.Y. 2010) ........................................................................................ 24

*Garbaccio v. St. Joseph's Hospit. and Med. Center and Subsidiaries,*
2017 WL 1196458 (D.N.J. March 13, 2017) ................................................................. 19, 20

*Gholson v. Sheeder,*
2019 WL 5578866 (W.D.Pa., Oct. 19, 2019) .................................................................... 17

*Hall v. Hall,*
138 S.Ct. 1118 (2018) ...................................................................................................... 4,16

*In re 5-Hour Energy Marketing v. Innovation Ventures, LLC,*
2013 WL 12134144 (C.D. Cal. Nov. 8, 2013) ................................................................... 20

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Litig.,*
55 F.3d 768 (3d Cir. 1995) .................................................................................................... 5

*In re Insulin Pricing Litig.,*
2017 WL 4122437 (D.N.J. Sept. 18, 2017) ....................................................................... 19

*Kulig v. Midland Funding, LLC,*
2014 WL 5017817 (S.D.N.Y. 2014) .................................................................................. 23

*Porath v. Logitech, Inc.,*
2019 WL 266258 (N.D. Cal. Jan. 18, 2019) ...................................................................... 25

*Staton v. Boeing Co.,*
327 F.3d 938 (9th Cir. 2003) .............................................................................................. 14

*Viveros v. VPP Group, LLC,*
   2013 WL 3733388 (W.D.Wis. July 15, 2013) ................................................................. 24

*Wagner v. Lehman Bros. Kuhn Loeb, Inc.,*
   646 F.Supp. 643 (N.D.Ill. 1986) ................................................................................. 24

*Weber v. Goodman,*
   9 F.Supp.2d 163 (E.D.N.Y. 1998) ............................................................................... 24

**<u>Statutes</u>**
35 U.S.C § 297 ........................................................................................................................ 5

**<u>Rules</u>**
Federal Rule of Civil Procedure 23 ............................................................................... 4
Federal Rule of Civil Procedure 42(a) .......................................................................... 16

207 Pa. Code § 7.2 ................................................................................................................ 8

Plaintiffs Etta Calhoun, Sherry Porter and Cynthia Gray, in *Calhoun et al. v. Invention Submission Corp. et al.*,. No. 18 Civ. 1022 (W.D. Pa.) and Plaintiffs Geta Miclaus and Vim and Kevin Byrne, in *Miclaus et al. v. Invention Submission Corp. et al.*, 20 Civ. 00681 (W.D. Pa.), (collectively, the "*Calhoun* Plaintiffs" and the "*Calhoun* Actions"), submit this Memorandum of Law in opposition to the January 25, 2020 motions of Plaintiffs in *Austin et al. v. Invention Submission Corp., et al.*, 19 Civ. 1396 (W.D. Pa.) (the "*Austin* Plaintiffs" and the "*Austin* Action"), and in support of the *Calhoun* Plaintiffs' motions to consolidate the lawsuits for purposes of pretrial management and discovery, and to appoint the Oxman Law Group PLLC ("Oxman") as interim lead class counsel.

## PRELIMINARY STATEMENT

At first blush, this controversy may appear to be a run-of-the-mill squabble between Plaintiffs' firms vying for lead counsel. The *Calhoun* Plaintiffs implore the Court to look past this facade.

The conduct of Berger Montague PC ("BM") described below is beyond the pale, and most importantly illustrates that BM's interests are not aligned with the putative class. BM seeks to undermine the integrity of the adjudicative process, going so far as to violate its duty of candor to this Court by making representations to the Court that are knowingly and provably false.

Unlike many class actions, which sometimes appear to be lawyer-driven controversies related to seemingly inconsequential wrongs (such as robocalls or underfilled bags of potato chips), this case seeks to remedy tremendous wrongs to real people. Plaintiffs in these actions often relinquished their entire life savings – spending upwards of $15,000 each – in exchange for InventHelp's worthless services. As such, fiduciary oversight is of paramount importance here.

*Calhoun* Counsel have always put the best interests of the putative class first. The best interests of the class appear to run contrary to BM's behavior, which includes:

- Gathering potential plaintiffs via a deceptive online solicitation that violates Pennsylvania Rules governing attorney advertising;

- A settlement meeting with InventHelp[1] principal Robert J. Susa at a time when BM had filed no case and the only claims on record were those of the *Calhoun* Plaintiffs;

- A defanged Complaint filed three months after that settlement meeting, and 18 months after *Calhoun*, that does not name Susa (personally liable under the AIPA) nor other key Defendants, alleges tailor-made wrongs that can be righted by mere injunctive relief, and studiously avoids allegations of intentional wrongdoing even though there is abundant evidence of such;

- Failing to object to this Court's Report and Recommendation dismissing two of the four Defendants named in *Austin*, thereby waiving all right of appeal;

- Arranging *ex parte* a last-minute mediation on the eve of the *Calhoun* Action's Rule 16 Conference and then strenuously pushing for settlement based upon the premise that InventHelp makes no profit;

- A back door, *quid-pro-quo* arrangement with Kirby McInerney, LLC ("Kirby"), former co-counsel with Oxman, leveraging future lucrative partnerships between BM and Kirby <u>in exchange for Kirby's withdrawal from this case,</u> then turning around and deceptively mischaracterizing Kirby's withdrawal to this Court in order to undermine Oxman;

- Pre-mediation representations to Kirby and Oxman that 

---

[1] Robert J. Susa is principal of Invention Submission Corporation d/b/a InventHelp, Technosystems Consolidated Corp., Technosystems Service Corp., Western Invention Submission Corp. d/b/a/ Western InventHelp, Universal Payment Corporation ("UPC"), and Intromark Incorporated (collectively, including Susa, "InventHelp" or "InventHelp Defendants").

- A mediation designed and executed not for negotiation, but for gamesmanship, and employing a mediator, in Shanon Carson's own words, with whom he had worked many times and who, at his behest, would bless solely non-monetary relief for the class; and

- Making knowingly false statements to this Court.

The facts speak for themselves. In the days and weeks leading up to the Court's originally-scheduled Rule 16 Conference, InventHelp and *Calhoun* Counsel engaged in multiple discussions regarding their Joint Rule 26(f) Report, and yet InventHelp made not a peep about its settlement-related maneuverings with BM. This is indicative of a "reverse auction," whereby defense counsel pick the most compliant counsel from competing class actions in order to settle on unduly favorable terms.

The *Calhoun* Plaintiffs took part in the June 4 mediation in good faith, and are and always have been willing to engage in good faith settlement discussions with the InventHelp Defendants.

BM's papers in support of its motion to be appointed lead counsel are comprised almost exclusively of *ad hominem* attacks on lead attorney Julie Pechersky Plitt (former Partner of Katten Muchin Rosenman LLP, a 500-attorney national law firm, current Partner of prestigious trial boutique the Oxman Law Group, and a federal court and class action practitioner for 22 years), characterizing her as "silly" and "absurd" and containing boldfaced lies about Oxman's participation in the June 4 mediation. BM also audaciously misrepresents the reasons behind Kirby's withdrawal. These lies will be addressed herein and can be rebutted with documentary evidence.

BM's utter lack of candor and decorum aside, the non-substantive attacks on Ms. Plitt make clear that BM recognizes that the facts and procedural history of these actions are not on its side.

Importantly, the claims most amenable to class-wide resolution – the AIPA "Disclosure Violations" asserting that the uniform disclosures distributed to all IH customers are inaccurate and

incomplete – are advanced in the *Calhoun* Actions, but not in *Austin.* These claims are subject to statutory damages of $5,000 per client.

On July 6, 2020, BM and InventHelp filed a Joint Status Report informing the Court that their second meditation resulted in an impasse. They realize that the broad release they contemplate (including for Susa and financing company UPC), when the *Austin* Action failed to even name those parties in the first place, would be presumptively inadequate under Rule 23. Instead, BM prematurely seeks consolidation "for all purposes,"[2] to file a single master complaint, and to be appointed lead counsel over claims and Defendants noticeably absent from *Austin.*

But, BM provides no legitimate reason why: (1) the *Austin* Action failed to name Susa, UPC, Technosystems Consolidated Corp., or the Patent Attorney Defendants; (2) BM did not object to Judge Dodge's April 13, 2020 Report and Recommendation in *Austin* ("R&R") dismissing Intromark Inc. and Technosystems Services Corp.; or (3) the claims in *Austin* are so watered-down. Oxman has communicated with hundreds of supposed "DataBank" companies, and an exceedingly high percentage of those companies claim to have never signed nondisclosure agreements nor to even know what InventHelp is. Certainly, a similar investigation by BM would have uncovered comparable results. And yet, the *Austin* Action inordinately focuses on InventHelp's "negligent procedures." In fact, the *Austin* Action is utterly silent as to a key part of InventHelp's procedures: the patent searches and opinions.

BM argues that the pared-down *Austin* Complaint is the product of vast experience. Oxman does not dispute this – it certainly illustrates BM's vast experience drafting class action complaints alleging

---

[2] During the July 8, 2020 conference before the Court, Shanon Carson mischaracterized the *Calhoun* Plaintiffs' prior motion for consolidation in these actions, claiming that the consolidation sought was for "all purposes." Nowhere do the *Calhoun* Plaintiffs' filings use that language, (*see Calhoun* ECF Doc. Nos. 107 and 121), and consolidation for "all purposes" (which would include trial) is most certainly premature; rather, the *Calhoun* and *Austin* Actions can and be consolidated for discovery and other pretrial procedures at this point without merging the cases into one. *See Hall v. Hall,* 138 S.Ct. 1118, 1130-31 (2018).

negligent company practices that can be swiftly and painlessly remedied with prospective injunctive relief (and a hefty attorneys' fee, of course). Mr. Carson apparently believes that he can pull the wool over the Court's eyes.[3]

While many of the unsavory practices on full display here appear to be business-as-usual, the *Calhoun* Plaintiffs beseech this Court to examine the facts at hand, and to save these putative class members from being taken on yet another ride. "When class counsel have demonstrated a lack of integrity, a court can have no confidence that they will act as conscientious fiduciaries of the class." *Creative Montessori Learning Centers v. Ashford Gear LLC*, 662 F.3d 913, 918 (7th Cir. 2011)(Posner, J.). The *Calhoun* Plaintiffs are counting on this Court to preserve the integrity of the adversarial process and appoint lead counsel that will discharge its duties to the class and to this Court.

## **BACKGROUND**

### A. The *Calhoun* and *Miclaus* Actions

The primary thrust of the *Calhoun* Actions is violation of the American Inventors Protection Act of 1999, 35 U.S.C § 297 ("AIPA"). The AIPA prohibits two types of malfeasance on the part of invention promotion companies. Subsection (a) requires detailed disclosure of certain data as to the firms' customers, including the number of customers who obtained licensing agreements and profits by virtue of the firms' services ("Disclosure Violations"). Subsection (b) prohibits "false and fraudulent" representations ("Representation Violations"). The *Calhoun* Actions allege both Disclosure Violations and Representation Violations. The *Austin* Action alleges only Representation Violations.

---

[3] Noted jurist Richard Posner succinctly put it: "From the selfish standpoint of class counsel and the defendant, [] the optimal settlement is one modest in overall amount but heavily tilted toward attorneys' fees." *Eubank v. Pella Corp.*, 753 F.3d 718, 720 (7th Cir. 2014). *See In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Litig.*, 55 F.3d 768, 802 (3d Cir. 1995)("the principal-agent problem endemic to class actions [creates] a situation where the defendants and plaintiffs can collusively settle litigation in a manner that is adverse to the class's interest").

The *Calhoun* and *Austin* Actions commonly assert AIPA Representation Violations and breach of contract by virtue of InventHelp's DataBank, which purports to be a list of companies that have signed nondisclosure agreements with InventHelp in order to "review new ideas in confidence." However, the *Calhoun* Actions allege that InventHelp's representations as to the DataBank are knowingly and objectively false, whereas the *Austin* Action appears to allege merely that the process is not up to snuff. The AIPA provides for statutory damages in the amount of $5,000 or more for each AIPA violation, and allows for treble damages in the event of intentional wrongdoing.

The *Calhoun* Actions allege, among other things, that InventHelp knowingly, uniformly and falsely represents to clients that certain well-known entities, brands and stores, including K-Mart, Walmart, Lysol, Air Wick, Heinz and Carnegie Mellon University, are registered in its DataBank; the *Calhoun* and *Miclaus* Complaints attach examples of these uniform misrepresentations. *See Calhoun* SAC Exs. I and J; *Miclaus* Exs. A and B. The *Calhoun* Actions also allege that a significant percentage of the companies listed in InventHelp's DataBank have not entered into nondisclosure agreements with InventHelp, have not ever heard of InventHelp, or do not even exist.

*Austin*, on the other hand, alleges that InventHelp does not properly maintain its DataBank or employ proper techniques to ensure appropriate matches between the proposed inventions and companies. *See* R&R at 17; June 25, 2020 Mem. In Support of BM Lead Counsel Motion (*Calhoun* ECF. Doc. No. 135)("BM Mem.") at 4. This is an important distinction – InventHelp and BM, hand in hand, can argue that 'improved procedures' will remedy the problems with the DataBank, and thus that prospective injunctive relief, without more, is appropriate relief for the class: A settlement perfectly crafted to mirror the *Austin* Action's allegations, all wrapped up in a neat little bow.

As to Disclosure Violations, the *Calhoun* Actions allege that InventHelp's AIPA-mandated disclosures are inaccurate and incomplete. Because identical disclosures are presented to each and every

customer, the AIPA Disclosure Violation claims are particularly well-suited for class treatment. The *Austin* action filed by BM does not allege Disclosure Violations.

InventHelp and *Calhoun* Counsel met and conferred four times and filed a Joint Rule 26(f) Report and ADR Stipulation on May 14, 2020. The Court scheduled a Rule 16 Conference for May 21, 2020. At *8:50 a.m.* the morning of May 19, 2020 – four days after InventHelp signed off on the ADR Stipulation in *Calhoun*, BM informed *Calhoun* Counsel via email that they planned to file a "motion to attend" the Rule 16 Conference, vaguely asserting that they had "information to share with you and the Court about the litigation," and giving *Calhoun* Counsel until *10:30 a.m.* to consent to the request. That one email was the extent of BM's meet and confer efforts.

## B.    The Later-Filed Copy-Cat *Austin* Action

BM filed *Austin* on October 25, 2019, more than 18 months after the original *Calhoun* Complaint, 6 months after the *Calhoun* SAC, and after the *Calhoun* Action had already survived Defendants' motions to dismiss and strike.

A comparison of the pleadings in the two actions makes clear that the *Austin* Action parrots and is completely subsumed within the *Calhoun* Action. The *Austin* Action has less robust factual allegations, seeks recovery from fewer Defendants, and asserts fewer claims. Most notable is the *Austin* Complaint's studious avoidance of allegations of intentional or recklessly indifferent wrongdoing that could entitle Plaintiffs to punitive damages under the AIPA. Shanon Carson admits that he met with Mr. Susa and his attorneys three months prior to filing the *Austin* Action. *See Calhoun* ECF No. 116 at Para. 6.

Judge Dodge's R&R recommended that Technosystems Services Corp. and Intromark Inc. be dismissed from the *Austin* Action. BM did not file objections, thereby waiving all right to appeal, and Judge Bissoon adopted the R&R and **DISMISSED WITH PREJUDICE** those

7

Defendants. Thus, the only two Defendants that remain in *Austin* are InventHelp and Western InventHelp. By contrast, there are nine (9) named Defendants in *Calhoun*, all of which moved to dismiss, and all of which remain in the case.

## C.    BM's Deceptive Solicitations

The *Austin* Action was precipitated by BM's deceptive online advertisement that attached the *Calhoun* Complaint. Descriptions the solicitations are set forth in the accompanying Declaration of Julie Pechersky Plitt and copies are attached at *Calhoun* ECF No. 122.

In sum, prior to filing the *Austin* Action, BM posted a solicitation on the internet website "ClassAction.org" that attached and extensively quoted from the *Calhoun* Complaint. It nowhere contained any indication that the webpage was on behalf of and paid for by BM, which BM attorneys and offices were responsible for the content, nor the manner in which BM compensates Classacton.org, in contravention of Pennsylvania Rules of Professional Conduct, 207 Pa. Code §§ 7.2(i)7.2(i) and (k). After Oxman sent a cease and desist to Classaction.org, BM replaced the *Calhoun* Complaint and quotes with those of *Austin*. After Oxman and Kirby filed documents unmasking the deceptive advertisement, BM revised it once again, for the very first time inserting the language: "The information submitted on this page will be forwarded to [BM] who has sponsored this investigation."

These solicitations alone are problematic for BM's lead counsel appointment. *See Creative Montessori,* 662 F.3d at 918 (holding class counsel inadequate because attorneys obtained plaintiff from distribution list of fax recipients).

## D.    InventHelp Defendants' Silence Regarding Its and BM's Machinations

Despite having engaged in settlement related discussions with BM that predate the filing of the *Austin* Action, defense counsel never properly disclosed this, even during the four conference calls

negotiating the Rule 26(f) Report. On the eve of this Court's Rule 16 Conference in *Calhoun*, BM and InventHelp hastily set a date for mediation and "invited" *Calhoun* Plaintiffs' counsel to attend.

Previously, InventHelp moved for sanctions against *Calhoun* counsel (*see Calhoun* ECF Nos. 75, 76), complaining of a website launched by the Oxman about the case, while completely ignoring BM's advertisement on Classaction.org that contained *identical language*. Mr. Carson represents that he has spoken to "thousands" of putative plaintiffs by virtue of that website. (BM Mem at 9-10). Yet InventHelp moved to silence Oxman, but not BM.

## E.   BM's Lies About Kirby's Withdrawal

BM's mendacity is nothing short of shocking. BM itself orchestrated Kirby's withdrawal from the case, enticing Kirby with the promise of lucrative partnerships in antitrust class actions, and then pressuring Kirby to sever its relationship with Oxman in exchange for those partnerships. At the same time, BM urged Kirby to lean on Oxman ████████████████████████████████████████ ████████████████ to cover up details about BM's dealings with Classaction.org. When that did not work, BM weaponized and mischaracterized Kirby's withdrawal to this Court.

BM's tactics are appalling in their own right; but for purposes of this motion, BM's actions illustrate its manipulation of the InventHelp litigation for its own benefit, sabotaging *Calhoun*, a strong case that was moving into discovery, at the expense of the class. BM's statements also illustrate Mr. Carson's wholesale willingness to lie to this Court. "When class counsel have demonstrated a lack of integrity, a court can have no confidence that they will act as conscientious fiduciaries of the class." *Creative Montessori,* 662 F.3d at 918.

*       *       *

BM claims that Oxman's arguments in its June 9, 2020 filings make "wildly inaccurate and irresponsible statements claiming that the mediation was not at arm's-length and other claims of

improper conduct that make it appear that [BM is] unqualified to serve as class counsel." (BM Mem. at 3). Oxman's June 9 filings state that Oxman did not find the mediation productive, and nothing more. (*See Calhoun* ECF Nos. 120-122).

BM's papers repeatedly and falsely claim that Kirby withdrew because Kirby attorneys were "first-hand witnesses to Plitt/Oxman's conduct and know the falsity and absurdness of Plitt/Oxman's allegations." (BM Mem. at 6). BM characterizes Plitt as "silly" and states: "[Kirby's] withdrawal [] from its relationship with Plitt/Oxman and from the *Calhoun* case entirely speaks volumes." (*Id*).

Elsewhere BM states, "Most tellingly, Plitt/Oxman's own co-counsel [Kirby] filed a motion yesterday to completely withdraw from the case . . . apparently for irreconcilable conflicts with Plitt/Oxman . . . [who] took positions that [Kirby] would not support." (*Id.* at 4). BM also states, "Plitt/Oxman's *own co-counsel* [Kirby] thought it imperative to withdraw yesterday from its relationship with Plitt/Oxman" by virtue of Oxman's "false statements" and "absurd inferences." (*Id.* at 8). BM asserts that "Plitt/Oxman has shown zero interest in working cooperatively with others, including its own co-counsel [Kirby] (as demonstrated by Kirby's withdrawal yesterday)." (*Id.* at 14).

In truth, BM offered Kirby lucrative business in exchange for Kirby's withdrawal, and yet now seeks to convince this Court that the withdrawal was brought on by Julie Pechersky Plitt's "silly" and "absurd" ideas and conduct that have "no basis in reality." BM's misrepresentations are a breach of its duty of candor to this Court, and explicitly invite the Court to make what BM knows to be untrue and improper inferences. Most importantly, BM's actions cannot in any way be construed as inuring to the benefit of the putative class.

On the morning of May 19, 2020, BM informed *Calhoun* Counsel of its intention to file a "motion to attend" the May 21 Rule 16 Conference. Kirby and Oxman immediately began work on an aggressive opposition to that motion, drafting papers until past midnight that contained details about

BM's solicitations on Classaction.org, among other things. (July 13, 2020 Declaration of Julie Pechersky Plitt ("Plitt Dec.") ¶ 36).

At *8:03 a.m.* the morning of May 20, Kirby partner Ira Press sent the Oxman/Kirby team the following email:

David Kovel of Kirby apparently had a telephone conversation with BM and then David and Ira spoke with Oxman attorney Julie Plitt on May 20 at approximately *9:30 a.m.* (*Id.* ¶ 38) They relayed BM's position that BM did not want the papers drafted by Oxman and Kirby discussing Classaction.org to see the light of day, that BM management viewed Shanon Carson's use of Classaction.org as problematic.

to muzzle Oxman's statements about Classaction.org in the forthcoming papers. (*Id.*)

Ira and David told Julie that at BM's behest, Kirby would "fall on its sword" and relinquish the lodestar it had accumulated in the *Calhoun* Actions. (*Id.* ¶ 39) Kirby would bow out of *Calhoun* in exchange for future partnerships between Kirby and BM in the antitrust field that would be more profitable for Kirby. (*Id.*). Immediately after that call, by email dated May 20 at *10:01 a.m.*, Julie sent Ira a message illustrating that this conversation occurred: "

11

████████████████████████████████████████████
████████████████████████

In follow-up conversations, Julie expressed to Ira her reservations about partnering with BM given her past interactions with Shanon Carson and BM's apparent willingness to sell out the class members. (*Id.* ¶ 42). Ira offered to broker a deal between Oxman and BM. (*Id.* ¶ 41, Ex. 3).

Days passed, and Julie continued to feel uncomfortable partnering with BM. (*Id.* ¶ 43). On the morning of Wednesday May 27, Julie had another conversation with Ira Press and David Kovel of Kirby. (*Id.* ¶ 45). David Kovel told her that BM no longer felt the need to partner with Oxman because Oxman and Kirby never filed the offending papers. (*Id.*)

During and after that call, Julie and Ira discussed their hope that *Calhoun* Counsel's participation in the June 4 mediation would guard against a potentially collusive settlement, and that they could use the mediation to explore InventHelp's and Susa's financial wherewithal. (*Id.* ¶¶ 43, 46). However, Ira also made clear that Kirby firm management had determined that the potential lucrative partnerships that BM had promised precluded Kirby from overtly criticizing BM going forward. (*Id.*)

Ultimately, Julie and Ira agreed that Kirby would remain in the case at least for the short term in order to attend the June 4 mediation alongside Oxman in the hopes that the *Calhoun* Plaintiffs could pressure InventHelp and BM to agree to provide meaningful relief to the class. (*Id.* ¶ 46). Nonetheless, Ira made clear both before and after the mediation that Kirby would no longer join in any papers opposing or criticizing BM because doing so would jeopardize future lucrative partnerships. (*Id.*)

The mediation was not productive and appeared to be pure gamesmanship. It was also premised on the assumption that InventHelp is not a profitable business. Yet, ████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████

In the meantime, Oxman repeatedly attempted to schedule a meet and confer with BM regarding the proposed sanctions motion. (*Id.* ¶ 76). BM ignored emails and resisted those efforts. BM finally agreed to a call on June 25, so long as InventHelp could also participate.[4] (*Id.*) Not so coincidentally, on June 24, the day before the meet and confer, Ira called Julie and told her that he was under pressure from his partners and BM to file a notice of withdrawal that day. (*Id.* ¶ 77). On June 24, Kirby filed its notice. (*Calhoun* ECF No. 130).

The very next day, Shanon Carson filed papers to be appointed lead counsel, relying heavily upon Kirby's withdrawal as support: "Most tellingly, Plitt/Oxman's own co-counsel [Kirby] filed a motion yesterday to completely withdraw from the case . . . apparently for irreconcilable conflicts with Plitt/Oxman . . . [who] took positions that [Kirby] would not support." (BM Mem. at 4).

---

[4] Oxman and counsel for the InventHelp Defendants had already conducted their meet and confer on June 17. During that call counsel for InventHelp repeatedly and pointedly asked about Kirby's continued participation in the case, seeming to indicate that they, along with BM, were eagerly awaiting the withdrawal. (*Id.* ¶ 75).

BM's papers make the knowingly false assertion that Kirby withdrew because Kirby attorneys were "witnesses to Plitt/Oxman's conduct and know the falsity and absurdness of Plitt/Oxman's allegations." (BM Mem. at []). BM characterizes Plitt as "silly" and states: "[Kirby's] withdrawal [] from its relationship with Plitt/Oxman and from the *Calhoun* case entirely speaks volumes." (*Id.* at 7).

BM misleadingly states, "Most tellingly, Plitt/Oxman's own co-counsel [Kirby] filed a motion yesterday to completely withdraw from the case . . . apparently for irreconcilable conflicts with Plitt/Oxman . . . [who] took positions that [Kirby] would not support" (*id.* at 4) and argues that the withdrawal was due to "Plitt/Oxman's conduct" (*id.* at 16)."[5]

BM's fabrications are a breach of its duty of candor to this Court, and explicitly invite the Court to make what BM knows to be inaccurate inferences. Most importantly, BM's actions cannot in any way be construed as inuring to the benefit of the putative class. *Cf. Staton v. Boeing Co.*, 327 F.3d 938, 960 (9th Cir. 2003)(noting that "secret cabals" can render representation in class action inadequate).

## F.    BM's Lies About Oxman's Participation in the Mediation

BM states: "Mr. Oxman attended that first day of mediation only partially before leaving (demonstrably showing his disinterest in the case). Ms. Plitt attended most of the mediation but she too left before the mediator declared the first day concluded." (BM Mem. at 3). In fact, Mr. Oxman signed off at *5 p.m.*, Kirby attorneys signed off at *6 and 7:50* p.m., and Ms. Plitt also signed off at *7:50* p.m., but then immediately returned when the mediator "demanded" that she do so.

The accompanying Declaration and emails between the Oxman and Kirby set forth the happenings of the mediation in more detail. In sum, the Zoom mediation ran from *9:30 a.m.* to

---

[5] Oxman does not know whether BM and Kirby entered into an agreement whereby Kirby can receive "lodestar protection" in exchange for dropping out of the *Calhoun* Actions, meaning that if BM were to collect attorneys' fees in these actions, it would pay Kirby the lodestar it accumulated while working with Oxman. Apparently, such practices are common.

BM's own papers set forth the false premise upon which the mediation was based: that the financial condition of InventHelp is precarious. (*See* BM Mem. at 5-6). *Calhoun* Counsel were and are not convinced. According to InventHelp's own disclosures, as of 2017, it charged between $11,900 and $16,900 for "Submission Services." Those disclosures state that between 2014 and 2016, InventHelp (not including Western InventHelp) signed Submission Agreements with 7,039 clients. Using the conservative calculation of $12,000 per Submission Agreement, that totals ***over $84 million*** in just those two years.

More recent disclosures show comparable numbers. *Calhoun* Counsel have conducted significant investigation into the InventHelp Defendants' business model and found that there is very little overhead. *Calhoun* Counsel have also reviewed hundreds of putative plaintiffs' paperwork and it appears that possibly half of all customers pay these exorbitant fees outright, instead of financing through UPC. While it is unlikely that InventHelp can make all of its victims whole, the joint claim of BM and InventHelp that InventHelp's business is unprofitable is, quite simply, unconvincing.



## **ARGUMENT**

### I. CONSOLIDATION FOR PRETRIAL PROCEEDINGS IS APPROPRIATE

Consolidation is undoubtedly appropriate here. However, "consolidation for all purposes" as proposed by the *Austin* Plaintiffs is neither necessary nor proper at this time.

Federal Rule of Civil Procedure 42(a) provides that "[i]f actions before the court involve a common question of law or fact, the court may: (1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay." "[D]istrict courts enjoy substantial discretion in deciding whether and to what extent to consolidate cases." *Hall v. Hall*, 138 S.Ct. 1118, 1131 (2018). Consolidation for "all purposes" as advanced by BM necessarily includes consolidation for class certification, trial, and other late-stage proceedings. Such consolidation at this juncture is premature given that class certification may not be sought for all claims, and proof at trial for the *Calhoun* Actions' Disclosure Violation claims and fraud claims, among others, would most certainly differ from proof for the *Austin* "improper procedure" claims.

As held by this Court, "[t]he court's discretion extends to the very form that consolidation takes." *Gholson v. Sheeder*, 2019 WL 5578866, *2 (W.D.Pa., Oct. 19, 2019)(Dodge, U.S.M.J.)(internal citation omitted). "In exercising its discretion, a district court should consider whether it is fair to the parties to consolidate, and whether consolidation will promote efficiency, conserve resources, and avoid undue delay, duplication of effort, and inconsistent results." *Id.* "Consolidation may be expressly limited to pretrial proceedings, including pleadings and discovery. The Supreme Court has held that consolidation does not merge the consolidated suits into one lawsuit, change the rights of the parties, or make those who were parties in one suit parties in another." *Id.*

Consolidation for purposes of discovery and other pretrial matters obviously makes sense here. Allowing BM to file a master complaint and sideline Oxman does not. BM's failure to assert the full array of claims and Defendants that survived dismissal in *Calhoun* raises a red flag, and indicates that BM may not purse Plaintiffs' interests diligently. Typically in situations with competing "copy-cat" complaints, the later-filed actions mimic and incorporate the first-filed action, especially where, as here, the first action survived two motions to dismiss. Here, BM seeks to fold the much more comprehensive *Calhoun* Action into the *Austin* Action and then to be designated sole lead counsel to prosecute all claims against all Defendants. Defendants have already filed answers in *Calhoun* and *Austin*; the *Miclaus* Action is identical to *Calhoun* except that it omits the claims dismissed in *Calhoun*, and asserts "Disclosure Violations" by virtue of omissions that, while adequately pled in *Calhoun*, were held to be untimely. Thus, filing Answers to *Miclaus* would take no more time than filing Answers to a new, consolidated master complaint. A single case management order that will govern pretrial matters in all three cases could issue at this point without a single master complaint. *See Gholson*, 2019 WL 5578866 at *3. The *Calhoun* Plaintiffs thus respectfully request that at this juncture, the Court consolidate the cases for purposes of discovery and other pretrial matters. *See Id.*

## II.    OXMAN IS BEST SUITED TO ACT AS INTERIM LEAD COUNSEL BECAUSE IT WILL MOST ADEQUATELY REPRESENT THE CLASS AND MOST EFFICIENTLY PROSECUTE THE CLAIMS

Much ink has been spilled in academic journals and elsewhere lamenting the ways in which enterprising plaintiffs' firms can abuse the class action device. *See e.g.,* Elizabeth C. Burch, "Judging Multidistrict Litigation," 90 *N.Y.U. L. Rev.* (2015); Martin H. Redish, *Wholesale Justice: Constitutional Democracy and the Problem of the Class Action Lawsuit* 1-2 (2009); Johnathan R. Macey & Geoffrey P. Miller, "The Plaintiffs' Attorneys Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform," 58 *U.Chi.L.Rev.* 1, 3-4 (1991). This case is a tutorial on those flaws. There can be no question that BM is a behemoth in the field, and Oxman does not argue otherwise. Indeed, Mr. Carson's experience gaming the system has been apparent at every turn.

Oxman has been forcefully prosecuting this action for over two years, has already spent significant resources doing so, and will continue to expend all resources reasonably necessary to do so. After BM filed *Austin* (18 months after *Calhoun*), Oxman recognized that BM would attempt to take over the cases, and thus Oxman partnered with Kirby. BM then enticed Kirby to break its agreement with Oxman, and yet now unreservedly misrepresents Kirby's withdrawal to this Court. Mr. Carson's cries that he has repeatedly attempted to cooperatively work with Ms. Plitt are belied by this behavior, as well as the tone and language of his most recent filing, which has been consistent throughout all interactions. One firm specializing in class action litigation has already offered to partner with Oxman going forward, and a discussions with two others are ongoing.(cite to Aff).

## A. The 23(g) Factors Weigh in Favor of Oxman

### 1. Counsel's Work in Identifying and Investigating the Claims

Oxman's work to date has been extensive. The *Calhoun* Action was the first case to develop and assert claims under the AIPA and was filed 18 months prior to the *Austin* Action. *See In re Insulin Pricing Litig.*, 2017 WL 4122437, *3 (D.N.J. Sept. 18, 2017)(awarding interim lead counsel status to firm because they "have invested over a year in developing the class's claim, and [] filed the first complaint in this litigation").

Similarly, the *Calhoun* Action "pleads additional theories of relief providing a more comprehensive protection for plaintiffs and the class." *Garbaccio v. St. Joseph's Hospit. and Med. Center and Subsidiaries*, 2017 WL 1196458, *3 (D.N.J. March 13, 2017)(awarding interim lead status to "Counsel [who] has spent years researching the [claims at issue] and were involved in the 'first wave of these [] cases' – well before [competing] Counsel").    To be sure, omitting certain common-law claims in order to better tailor an action to class certification makes some sense, but it is common, indeed usual, for counsel to seek class certification on only a subset of claims set forth in a complaint. That way, claims more suited for individual treatment are preserved in the event that class certification is denied. Even putting that aside, however, there is simply no logical reason for BM's failure to name Susa, UPC, Technosystems Consolidated Corp., and the Thomas Frost Defendants, nor is there any excuse for BM's failure to object to the R&R in order to preserve *Austin* Plaintiffs' rights.

In September 2017, Oxman was approached by a potential plaintiff and began an investigation. Among other efforts, counsel interviewed hundreds of InventHelp customers, performed research of supposed DataBank companies, reviewed thousands of pages of contracts, letters, DataBank lists, email correspondence, and other documents sent by the InventHelp Defendants and Patent Attorney Defendants to hundreds of clients, researched United States

Patent and Trademark Office filings in order to ascertain whether "dead ringer" patents already existed at the time that the InventHelp and Patent Attorney Defendants represented to clients that their proposed inventions were patentable, and conducted significant research, including legislative filings and history, on the AIPA, which is a statute that has not, until the *Calhoun* case, been vigorously litigated. *See In re 5-Hour Energy Marketing* v. *Innovation Ventures, LLC*, 2013 WL 12134144, *3 (C.D. Cal. Nov. 8, 2013)(attorneys first to file awarded interim lead counsel status, noting that firms "have done substantial work to develop and prosecute this matter, and have not ridden on the *Nguyen* case's coattails.")

Oxman's investigation also uncovered the InventHelp Defendants' clandestine formation of a brand-new invention promotion company, Evolve and Idea LLC. Evolve an Idea's website evinces absolutely no connection to InventHelp, in violation of the AIPA.

Since filing the Original Action, Oxman have aggressively pursued the proposed class' interests. Counsel has twice amended the *Calhoun* Complaint to sharpen its allegations in order to bring the most potent action against the Defendants. The *Calhoun* Actions "plead[] additional theories of relief providing a more comprehensive protection for plaintiffs and the class." *Garbaccio*, 2017 WL 1196458, *3. Oxman has laid the groundwork to immediately and aggressively pursue discovery.

### 2.     Counsel's Experience and Substantive Knowledge of Claims of the Type Asserted in this Litigation and Class Actions Generally

To read BM's papers, one would think that Julie Plitt is a first-year associate and that Oxman Law Group resides over a grocery store. In fact, Plitt and Oxman are accomplished litigators, as more fully set forth in the accompanying Declaration.

Oxman is a full-service litigation firm focusing on complex legal matters; Oxman lawyers are adept and experienced at trying cases to fruition if and when it serves the best interests of their clients. Oxman's lead counsel in this case is partner Julie Pechersky Plitt, who has over 22 years of experience

in the area of class action litigation. Few individuals and firms have any experience litigating AIPA claims; Ms. Plitt has been litigating this case as well as another AIPA case in the Southern District of New York, for the past three years, and has honed the AIPA claims, which are viable. Ms. Plitt has recently handled large cases arising under numerous federal and state statutes including the Securities and Exchange Act of 1934, the Racketeer Influenced and Corrupt Organizations Act, New York's Deceptive Practices and Advertising Laws, the Americans with Disabilities Act, and the Civil Rights Act of 1871 (42 U.S.C. § 1983). Prior to joining the Oxman Law Group in 2016, Ms. Plitt was Partner at Katten Muchin Rosenman LLP in New York, New York. *See Calhoun* ECF No. 99-9 (CV of Plitt and the Oxman firm). Ms. Plitt was able to secure notable results for clients, both plaintiffs and defendants, in an array of complex class actions: *Cross Media Marketing Corporation Securities Litigation* (representation of officers and directors in class action related to Federal Trade Commission charges); *Clarkson v. Coughlin* (representation of class of deaf and hearing impaired inmates in connection with enforcement of governmental Consent Decree); and *In re Laureate Education Corporation* (representation of chairman and CEO, interested members of board of directors, and lead private equity firm in shareholder litigation relating to over $3 billion "taking private" transaction by management).

Marc S. Oxman is the founding member of the Oxman Law Group. [6] He has tried over 200 jury cases to conclusion, and is widely regarded as an aggressive and successful trial lawyer, obtaining millions for his clients. He serves as senior trial counsel for numerous business entities and municipalities.

---

[6] Sadly, former Oxman member Richard L. Brodsky unexpectedly passed away in the COVID-19 crisis prior to the filing of the instant motion. Oxman's previous motion to be appointed interim lead counsel set forth Mr. Brodsky's resume, including obtaining settlements exceeding $200 on behalf of customers of Consolidated Edison Company of New York, Inc.

Oxman attorneys are not paper-churners that will needlessly accumulate an outsize lodestar. Given BM's repeated cries on InventHelp's behalf of poverty, this is an important factor.

### 3.  Oxman Has Committed Substantial Resources To Prosecute this Litigation

Throughout the past three years, Oxman has already expended significant resources and will continue to commit all resources reasonably necessary to vindicate the interests of the putative class, including amounts designated for the undertaking of broad discovery, the use of advanced software systems for analyzing electronic documents, and the commitment of investigative professionals and attorneys needed to advance the complex claims here and to represent Plaintiffs and the Class adequately against highly qualified defense counsel.

### 4.  The Discretionary Factors of Rule 23(g) Support Appointing Oxman as Interim Lead Class Counsel

BM's "conduct in this action does not look good, does not sound good, and does not smell good. In fact, it reeks." *Bodner v. Oreck Direct, LLC*, 2007 WL 1223777, *3 (N.D. Cal. April 25, 2007)(proposed class counsel rendered inadequate because "It is clear from the record that plaintiff's counsel, and not plaintiff, is the driving force behind this action. Such a 'cart before the horse' approach to litigation is not the proper mechanism for the vindication of legal rights.")

"Class counsel owe a fiduciary obligation of particular significance to their clients when the class members are consumers, who ordinarily lack both the monetary stake and the sophistication in legal and commercial matters that would motivate and enable them to monitor the efforts of class counsel on their behalf." *Creative Montessori*, 662 F.3d at 917.

There are three problems with appointing BM: (1) BM's lackluster litigation strategy, including not naming all pertinent defendants, not asserting all possible claims, not seeking maximal relief, and waiving *Austin* Plaintiffs' right to appeal; (2) corresponding indicia of collusion; and (3) BM's violation of the canons of ethics, including Shanon Carson's wholesale willingness to mislead this Court.

The R&R held that the *Austin* Complaint failed to state a claim against Technosystems and Intromark. BM could not be bothered to object to the R&R, thus waiving all right of appeal. As noted, the *Austin* Complaint's omission of Robert J. Susa as a Defendant is striking. Almost equally striking is the omission of UPC. The most basic review of IH customers' paperwork reveals that at least half of them financed their $15,000 Submission Agreements through UPC. Why, then, did BM omit this entity? Similarly, it appears that the Thomas Frost Defendants opined on the patentability of literally *thousands* Inventhelp customers' ideas every single year. How is this physically possible? Certainly, the Thomas Frost Defendants' liability is at least worth exploring, not just for monetary relief, but also for liability and fact-finding as to InventHelp's operations. To be sure, allegations of collusion are serious. However, the course of events here is too striking to ignore, and certainly at the very least creates the appearance of impropriety.

Even more worrisome, some of BM's statements (including the emphasis on injunctive relief and assertions as to InventHelp's limited resources) indicate that it and InventHelp may be attempting to lay the groundwork for Rule 23(b)(2) settlement; such a settlement would prevent opt outs, thus extinguishing all putative plaintiffs' rights with absolutely no recourse. Not only would such a tack be wholly inappropriate, but if that is BM's chosen route, then failure to name all InventHelp Defendants, including Susa, borders on legal malpractice: the InventHelp entities could go bankrupt, Susa's assets would be untouchable, and the asset pool available to Plaintiffs would be inordinately small.

Additionally, Mr. Carson's lack of candor to this Court as well as BM's solicitations in violation of the Rules of Professional conduct create problems because "[m]isconduct by class counsel that creates a serious doubt that counsel will represent the class loyally requires denial of class certification." *Kulig v. Midland Funding, LLC*, 2014 WL 5017817, *3 (S.D.N.Y. 2014) (holding that counsel's violation of New York Rules of Professional Responsibility rendered it inadequate to represent class).

*Viveros v. VPP Group, LLC,* 2013 WL 3733388, \*10-11 (W.D.Wis. July 13, 2013)(denying class certification and noting "a proper respect for ethical duties is obviously important in representing a class because class members have limited ability to control counsel's decisions"); *Weber v. Goodman,* 9 F.Supp.2d 163, 174 (E.D.N.Y. 1998)(*opinion modified on reconsideration,* 97-cv-1376, 1998 WL 1807355 (E.D.N.Y. June 1, 1998)("In sum, [plaintiff's counsel] refuses to comply with the ethical rules that apply to this Court" and is thereby inadequate to serve as class counsel).

"[I]n considering whether the proposed class counsels are adequate, the Court may consider the honesty and integrity of the putative class counsels, as they will stand in a fiduciary relationship with the class." *Friedman-Katz v. Lindt & Sprungli (USA), Inc.,* 270 F.R.D. 150, 160 (S.D.N.Y. 2010) (class counsel inadequate). *See Wagner v. Lehman Bros. Kuhn Loeb, Inc.,* 646 F.Supp. 643, 662 (N.D.Ill. 1986)(denying class certification because proposed class counsel's "violation of the canons of ethics requires a finding that he may not represent the class"))

In sum, the Austin Plaintiffs and their counsel should not be rewarded for copying well-researched claims developed and filed first by the Calhoun Plaintiffs, should not be rewarded for their blatant disregard for the Pennsylvania Rules of Professional Conduct, and should not be rewarded for custom crafting a Complaint ripe for a non-monetary settlement, while not even bothering to preserve those Plaintiffs' rights to assert other meritorious claims or to seek punitive damages.

## III. ALTERNATIVELY, THE COURT NEED NOT APPOINT INTERIM LEAD COUNSEL AT THIS TIME

Courts within the U.S. Court of Appeals for the Ninth Circuit (possibly the Circuit where more class actions are filed than any other) take an alternative approach: a Standing Order of operations requiring discovery and determination of whether the matters are suitable for class treatment prior to appointment of interim class counsel. *See e.g., In re Roundup Prod. Litig.,* 3:16-md-02741, (N.D. Cal.

March 20, 2020)(denying motion for appointment of interim lead counsel); *Porath v. Logitech, Inc.*, 2019 WL 266258, *3 (N.D. Cal. Jan. 18, 2019) (same). The commentary to Rule 23 suggests that appointment of interim lead counsel is appropriate where a "large number" of putative class actions are pending before a single court. Here, there are only two. It is also conceivable that an ADR process with a Court-appointed neutral that includes *Calhoun* Counsel can facilitate early settlement that will pass this Court's muster, as concerns of collusion or otherwise bad faith negotiating would be assuaged by the presence of Oxman. Thus, the Court need not appoint interim lead counsel at this time.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court enter an order (i)

consolidating the above-captioned actions for pretrial management pursuant to Rule 42(a); (ii)

appointing Oxman as Interim Lead Counsel for the consolidated actions; (iii) appointing Greenfield &

Kraut as Interim Liaison Counsel for the consolidated actions; and (iv) such other and further relief as

the Court may deem just and proper.


Dated: July 13, 2020
      White Plains, New York

                                    Respectfully submitted,

                                      OXMAN LAW GROUP, PLLC
                                      *Attorneys for Plaintiffs*

                                      By: _____
                                          JULIE PECHERSKY PLITT, ESQ.
                                          Bar #: JP-8607
                                    120 Bloomingdale Road, Suite 100
                                    White Plains, New York 10605
                                    (914) 422-3900
                                    (914) 422-3636 (Fax)
                                    jplitt@oxmanlaw.com

## CERTIFICATE OF SERVICE

I, Julie Pechersky Plitt, hereby certify that on July 13, 2020, I caused a true and correct copy of

the foregoing memorandum of law to be filed and served electronically via the Court's ECF

system.

/s/ Julie Pechersky Plitt
Julie Pechersky Plitt, Esq.
(Bar No. JP-8607)
